FILED & JUDGMENT ENTERED
Steven T. Salata

August 10 2021

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA CHARLOTTE DIVISION

In re:

DBMP LLC,

          Debtor.

Chapter 11

Case No. 20-30080

---

DBMP LLC,

          Plaintiff,

v.

THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000,

          Defendants.

Adv. Pro. No. 20-03004

**FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING ORDER: (I) DECLARING THAT THE AUTOMATIC STAY APPLIES TO CERTAIN ACTIONS AGAINST NON-DEBTORS, (II) DENYING MOTION OF THE OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS TO LIFT THE STAY, AND ALTERNATIVELY (III) PRELIMINARILY ENJOINING SUCH ACTIONS**

## I.    PROCEDURAL BACKGROUND

1.      On October 23, 2019, CertainTeed Corporation ("Old CertainTeed"), a building products manufacturer with significant asbestos liabilities, underwent a corporate restructuring, including a Texas state law divisional merger, where it divided itself into two new entities. One, CertainTeed LLC ("New CertainTeed"), was essentially a mirror image of Old CertainTeed: a fully operating company which retained all of Old CertainTeed's employees, the bulk of its assets and operations, and all of its non-asbestos creditors.  The other entity, DBMP LLC ("DBMP" or the "Debtor") was quite different. The merger allocated to DBMP no employees, no operations, and few assets. However, in one respect the merger was generous with DBMP: it was allocated 100% of Old CertainTeed's considerable asbestos liabilities.

2.      Three months later, on January 23, 2020 (the "Petition Date"), DBMP filed a voluntary chapter 11 petition (the "Chapter 11 Case") in this bankruptcy court as well as a complaint initiating this Adversary Proceeding [Adv. Pro. Dkt. 1].

### A.  The Preliminary Injunction Motion

3.      The complaint in turn was accompanied by a motion for a temporary restraining order, a preliminary injunction and, in the alternative, declaratory relief (the "Injunction Motion") [Adv. Pro. Dkt. 2].  Through this Injunction Motion, DBMP sought to protect New CertainTeed, some 80 affiliated entities ("Other Affiliates") and certain nonbankrupt distributors of asbestos-containing products for which Old CertainTeed had liability ("Distributors") (collectively, the "Protected Parties") from the filing or continued prosecution of actions that sought recovery on the asbestos-related claims, including claims for exposure to asbestos-containing products manufactured or sold by the Debtor's predecessor, Old CertainTeed. These, of course, were the asbestos liabilities exclusively allocated to DBMP in the divisional merger.  In

the alternative, the Debtor sought a declaration that the automatic stay in 11 U.S.C. § 362 applied to actions asserting or pursuing DBMP Asbestos Claims.

4.      On January 27, 2020, an emergency hearing was held on the Injunction Motion, and on January 29, 2020, this Court entered a Temporary Restraining Order ("TRO") [Adv. Pro. Dkt. 21].

5.      On February 6, 2020, certain asbestos personal injury claimants filed objections to the TRO [Adv. Pro. Dkt. 29-31]. Through orders entered on February 18, 2020, and after, the TRO was extended. Later with the consent of the parties, the TRO was twice extended through an evidentiary hearing and a ruling on the Injunction Motion. This extension was intended to maintain the status quo so that the estate fiduciaries and their professionals could be appointed and to permit the parties to conduct discovery.

6.      Upon appointment of the Official Committee of Asbestos Personal Injury Claimants (the "ACC") on February 14, 2020 [Dkt. 155] and later the Future Claimants' Representative on June 1, 2020 [Dkt. 310] (the "FCR" and, together with the ACC, the "Representatives"), the parties engaged in extensive discovery.[1]

7.      On January 13, 2021, the ACC filed its objection to the Injunction Motion [Adv. Pro. Dkt. 216] (the "ACC Objection"). That same day, the FCR filed his objection to the Injunction Motion [Adv. Pro. Dkt. 192] (the "FCR Objection").

8.      On February 5, 2021, the Debtor filed its *Omnibus Reply in Support of the Motion* [Adv. Pro. Dkt. 223] in response to both the ACC Objection and the FCR Objection (the

---

[1] Before formally moving to intervene in this Adversary Proceeding, the FCR participated in discovery by agreement of the parties. Later, the FCR was permitted to intervene in this action on March 15, 2021 [Adv. Pro. Dkt. 292].

"Reply"); and on February 19, 2021, the Debtor filed the *Notice of Filing of Appendix in Connection with Omnibus Reply in Support of the Motion* [Adv. Pro. Dkt. 236].

**B.  Base Case Relief From Stay Motion**

9.     Meanwhile, on January 13, 2021, the ACC filed a Motion to Lift the Stay Pursuant to 11 U.S.C. § 362 as to Certain Asbestos Personal Injury Claims (the "Stay Motion") in both the base bankruptcy case and this Adversary Proceeding [Dkt. 614, Adv. Pro. Dkt. 195]. In the Stay Motion, the ACC seeks to permit <u>all</u> asbestos claims against the Debtor to be filed, prosecuted, liquidated, and paid in the tort system with funding provided under a Funding Agreement between DBMP and New CertainTeed, as described herein.

10.     On February 5, 2021, the FCR joined the Stay Motion [Dkt. 654, Adv. Pro. Dkt. 220], whereas the Debtor and New CertainTeed objected to it [Dkt. 655-656, Adv. Pro. Dkt. 221].

11.     On February 11, 2021, a Stipulation and Agreed Order Regarding the Automatic Stay [Dkt. 664, Adv. Pro. Dkt. 230] was entered, providing that, "[n]otwithstanding section 362(e) of the Bankruptcy Code, the automatic stay shall not terminate as requested in the [Stay] Motion and shall remain in place pending the entry of an order by the Court adjudicating the [Stay] Motion" [Dkt. 664, Adv. Pro. Dkt. 230 at ¶ 1]. As with the extended TRO, this Stipulation was entered to maintain the status quo while the parties engaged in discovery and prepared for a hearing.

**C.  The Hearing and the Evidentiary Record**

12.     By consent, the Injunction Motion in the adversary proceeding and the ACC's base case Stay Motion were heard together on March 1 through 3, 2021, upon a consolidated evidentiary record. Follow up hearings were conducted on March 11 and 25, 2021.

13.     We would not ordinarily detail the evidence presented at hearing.  But, due to the COVID-19 pandemic, it was necessary to conduct these hearings by video conferencing technology, and the extensive evidentiary record was presented electronically.  For the benefit of a reviewing court, we will briefly summarize that evidence.

14.     By agreement, and to streamline the evidentiary presentation, the Parties proffered, and this Court later admitted certain testimony related to the two Motions via declaration and deposition.[2]

15.     On February 23, 2021, the Debtor filed its *Notice of Filing of Declarations in Support of the Motion* [Adv. Pro. Dkt. 238] and, with that notice, the declarations of Charles E. Bates, Ph.D. [Adv. Pro. Dkt. 238 at 4–57] ("Bates Decl."), Joseph N. Bondi [Adv. Pro. Dkt. 238 at 59–65] ("Bondi Decl."), Robert J. Panaro [Adv. Pro. Dkt. 238 at 67–77] ("Panaro Decl."), Mark Rayfield [Adv. Pro. Dkt. 238 at 79–83] ("Rayfield Decl."), and Michael T. Starczewski [Adv. Pro. Dkt. 238 at 85–107] ("Starczewski Decl." and, together with the Bates Decl., the Bondi Decl., the Panaro Decl., and the Rayfield Decl., the "Debtor's Hearing Declarations").

16.     On February 25, 2021, the Debtor filed its *Notice of Filing Debtor's Exhibits for March 1, 2021, Hearing* [Adv. Pro. Dkt. 243] and provided the Court with electronic and paper copies of its  exhibits.

17.     On February 26, 2021, the Representatives filed their *Notice of Filing of Select Cross-Examination of Certain of the Debtor's Witnesses by Deposition Testimony Designation* [Adv. Pro. Dkt. 245]; and on February 28, 2021, the Debtor filed its *Notice of Filing of Re-Direct Examination of Witnesses by Deposition Testimony and Supplemental Designation to Previously Designated Deposition Testimony* [Adv. Pro. Dkt. 248].

---

[2] *See, e.g., Stipulation Regarding Evidentiary Matters* [Adv. Pro. Dkt. 302] (the "Evidentiary Stipulation").

18.    The hearing conducted March 1 through March 3, 2021 included: (a) opening statements and arguments from the Debtor, the ACC, and the FCR; (b) live testimony from two expert witnesses on certain financial and restructuring matters: Stephen Coulombe of Berkeley Research Group, LLC ("BRG"), for the Debtor, and Matthew Diaz of FTI Consulting, Inc. ("FTI"), for the Representatives; (c) subject to certain evidentiary motions *in limine* and reservations of evidentiary objections, proffers of the Parties' evidence described above; *i.e.*, the Debtor's Hearing Declarations, the deposition designations and the Parties' exhibits.[3]

**D. Post-Hearing**

19.    After the Hearing, on March 24, 2021, the Parties filed the Evidentiary Stipulation in which the Parties agreed that several evidentiary motions *in limine* would be withdrawn, all previously asserted evidentiary objections would be withdrawn, and the Parties would not oppose admission into evidence of (a) the testimony proffered at the Hearing, whether elicited live during the Hearing or submitted through declarations or deposition designations or (b) the proffered exhibits [Adv. Pro. Dkt. 302].

20.    On March 31, 2021, the Parties filed post-petition briefs to address questions by the Court concerning the Texas Divisional Merger Statutes, [Adv. Pro. Dkts. 310, 311, 312].  Also, each side was invited to, and did, proffer proposed findings and conclusions (collectively, the "Post-Hearing Briefs").

21.    Since the Hearing, the Debtor offered its stipulation that the personal injury claim of any claimant who (a) had a pending DBMP Asbestos Claim as of the Petition Date and (b) was alive at that time, shall be preserved (with no impairment of the claimant's personal injury

---

[3] Hr'g Tr., 109:13-18, 139:18-142:19, 144:1-11, 144:20-145:18, 195:1-6; 220:2-21, Mar. 1, 2021; *see also* Adv. Pro. Dkts. 243, 249, 293, 294, 205; and (d) closing arguments from the Debtor, the ACC, and the FCR.

damages) even if the claimant subsequently dies (the "PI Damages Agreement").[4] Although the Representatives are adamantly opposed to the preliminary injunction, no party has objected to this concession should the injunction be granted.

Holding: By virtue of the Texas merger statutes, the asbestos claims of Old CertainTeed which the Representatives seek to return to the tort system are presently claims owed by DBMP and no other party.  Thus, they are subject to the automatic stay under Bankruptcy Code Sections 362(a)(1) and/or Section 105.

Due to the apparent negative effects of the Divisional Merger (and this ensuing bankruptcy filing) on the legal rights of Asbestos Claimants, that Merger and its allocations may constitute an avoidable fraudulent transfer or otherwise be subject to attack under remedial doctrines like alter ego and successor liability.  If so, New CertainTeed, et.al., could eventually be held responsible for Old CertainTeed's, now DBMP's, asbestos liabilities.

However, as the aforementioned apparent injuries are not specific to individual creditors but are instead "general" injuries (both to DBMP and the asbestos claimants) and with DBMP in chapter 11, if such remedial actions lie, they are either: (a) bankruptcy estate property under Section 541, and/or (b) avoidance actions which under the Fourth Circuit's "first crack" doctrine must be asserted by a bankruptcy trustee, and not individual creditors.[5] Thus, the causes of action by which the Divisional Merger might be contested—and through which claims might be asserted against the Protected Parties—are also subject to the automatic stay, particularly Section 362(a)(3).

---

[4] *See Debtor's Notice of Filing* its proposed findings of fact and conclusions of law related to the Motions (further describing the PI Damages Agreement).
[5] *See* Section III(D) below.

Essentially, what the Representatives seek by their opposition to the Preliminary Injunction and their Stay Motion is an end to this Chapter 11 Case. This is problematic because (1) there is no pending motion to dismiss, and (2) as Judge Beyer's recent *Bestwall* decision reflects, even if these actions reflect "bad faith" on the part of DBMP, under the Fourth Circuit's exacting *Carolin s*tandard, dismissal would be difficult to obtain at such an early stage of the bankruptcy case.[6]

Because the relief which the Representatives seek, dismissal, appears not directly obtainable, nor may it be had through indirect means—such as a grant of relief from stay to all asbestos claimants or through denial of the preliminary injunction.

For the present, we have a pending chapter 11 reorganization case. Given the potentially prejudicial effects of the Corporate Restructuring on asbestos claimants, the necessity of the Debtor reaching agreement on a Section 524(g) Plan and trust with a supermajority of the asbestos claimants, and the need to establish "good faith" at confirmation, this reorganization attempt may or may not bear fruit. However, under controlling Circuit precedent, DBMP is entitled to try to reorganize and to persuade the asbestos claimants to join it in a Section 524(g) plan. Clearly, reorganization will be impossible without the benefit of the automatic stay and the preliminary injunction.

Accordingly, and without endorsing Old CertainTeed and DBMP's prepetition actions, this Court concludes (1) the Section 362(a) automatic stay applies to these actions, (2) the Stay Motion must be Denied, and (3) the Preliminary Injunction Motion must be Granted.

---

[6] *Carolin Corp. v. Miller*, 886 F.2d 693, 700-01 (4th Cir. 1989).

To that end, and pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable to these proceedings by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure, enters the following Findings of Fact and Conclusions of Law in connection with that determination:

## II.    FINDINGS OF FACT[7]

### A.  The Parties and their Requests for Relief

22.    The Plaintiff in this Adversary Proceeding is DBMP, a North Carolina limited liability company and the debtor in possession in the Chapter 11 Case.

23.    The Defendants are those parties listed on Appendix A to the Injunction Motion and John and Jane Does 1-1000 (collectively, the "Defendants"). The Defendants listed on Appendix A are all plaintiffs in lawsuits, pending as of the Petition Date, who sought to hold, or may seek to hold, the Protected Parties liable for the DBMP Asbestos Claims. John and Jane Does 1-1000 are prospective plaintiffs who may, at any time while the Chapter 11 Case is pending, seek to hold the Protected Parties liable for the DBMP Asbestos Claims.

24.    The Protected Parties are identified in Appendix B to the Injunction Motion. They are essentially New CertainTeed, the Other Affiliates and the Distributors, entities which distributed asbestos-containing products manufactured or sold by Old CertainTeed (the "Distributors").

25.    "DBMP Asbestos Claims" are, collectively, any asbestos-related claims against DBMP, including all claims that formerly were asserted against (or that could have been asserted against) Old CertainTeed, relating in any way to asbestos or asbestos-containing

---

[7] To the extent any of the following findings of fact constitute conclusions of law, they are adopted and treated as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted and treated as such.

materials, but not including asbestos-related claims for which the exclusive remedy is provided under workers' compensation statutes and similar laws.

26.    During this Chapter 11 Case, DBMP has stated its intention to "permanently, globally, and fairly resolve" resolve all current and future DBMP Asbestos Claims "through the consummation of a consensual plan of reorganization that includes the establishment of a trust under section 524(g) of title 11 of the United States Code (the "Bankruptcy Code").[8]

27.    The Representatives are dismissive of the Debtor's avowed good intentions. They view this bankruptcy case as a gross abuse of chapter 11. They accuse New CertainTeed of seeking the benefits of bankruptcy without bearing any of the burdens.  And the Representatives view the Injunction Motion as simply the last link in a chain of several intentional actions (Corporate Restructuring, Divisional Merger, and the bankruptcy filing) intentionally undertaken by the CertainTeed entities for the purpose of isolating asbestos claimants and impairing their rights.

### B.  Old CertainTeed's and DBMP's Defense of DBMP's Asbestos Claims

28.    New CertainTeed, the Other Affiliates, and DBMP are part of a multinational building products conglomerate whose ultimate parent is a French corporation known as Compagnie de Saint-Gobain, headquartered in Paris.

29.    From the 1930s to 1993, Old CertainTeed manufactured and/or sold certain products that contained asbestos, including asbestos cement pipe, asphalt roofing products, other asbestos cement products, certain gypsum products, and specialty railroad insulation products.[9]

---

[8] Panaro 1st day Decl. ¶ 36; Starczewski Decl. ¶ 33.
[9] Starczewski Decl. ¶ 8.

30.     Since the 1970s, Old CertainTeed has faced hundreds of thousands of claims in the tort system for asbestos-induced personal injury and wrongful death.[10]

31.     Initially, Old CertainTeed was an insignificant defendant in these tort actions.[11] During the 1990s, Old CertainTeed paid less than $10 million per year in indemnity costs to resolve mesothelioma claims. However, as the primary asbestos manufacturers, commonly known as the "Big Dusties," began to file for bankruptcy protection in the early 2000s, the number of claims filed against Old CertainTeed increased dramatically.[12]

32.     Old CertainTeed's defense and indemnity spending increased, accordingly. Since 2002, Old CertainTeed spent on average more than $80 million per year in indemnity payments to resolve asbestos claims.[13] Old CertainTeed spent between approximately $20 million and $30 million per year to defend these lawsuits since 2001.[14]

33.     In total, since 2002, Old CertainTeed has incurred approximately $2 billion of expenses defending and resolving over 300,000 personal injury lawsuits relating to alleged asbestos exposure. Of this, Old CertainTeed paid approximately $1.5 billion "out of pocket" as its asbestos-related insurance coverage became exhausted.[15] Thus, there is no existent, much less shared, insurance between the Debtor and any other entity. From 2002 to 2019, CertainTeed's annual indemnity costs (payments of settlements and judgments) and defense costs ranged from approximately $80 million to over $160 million.[16]

---

[10] Panaro Decl. ¶ 27.
[11] The typical asbestos complaint names many different producers of asbestos containing products as defendants.
[12] *See* Pl.'s Ex. 1 (historical DBMP Asbestos Claim counts from the DBMP's claims database); Starczewski Decl. ¶ 11.
[13] *See* Pl.'s Ex. 2 (summary of defense and indemnity payments made by Old CertainTeed annually from 2002 to 2019); Starczewski Decl. ¶ 12.
[14] Starczewski Decl. ¶ 17; *see also* Bates Decl. ¶ 17.
[15] Starczewski Decl. ¶ 10; *see* Pl.'s Ex. 2 (summarizing defense and indemnity payments made by Old CertainTeed annually from 2002 to 2019).
[16] Informational Brief of DBMP LLC, at 18, 3:20-bk-30080, ECF No. 22; Panaro Decl. ¶ 30.

34. For cases filed since 2012 and tried to verdict, defense costs, on average, exceeded $1 million per case.[17]

35. As of the Petition Date, almost 60,000 asbestos-related claims were pending against Old CertainTeed and/or the Debtor across the United States. Approximately 32,200 of these are on active dockets, with the remainder on "inactive" dockets.[18]

36. Absent this bankruptcy filing, it is likely that thousands of additional claims would be filed against DBMP, New CertainTeed, and the Other Affiliates for decades to come.[19]

### C. Project Horizon and the 2019 Corporate Restructuring

37. Seeking a less expensive way of dealing with these tort liabilities, in 2019, Old CertainTeed engaged in a series of transactions (described herein and collectively referred to as the "Corporate Restructuring") which led to the Debtor's creation and its chapter 11 filing.[20]

38. Planning for the Corporate Restructuring began sometime prior to February 2018 and was conducted under the codename "Project Horizon."[21]  Project Horizon was an attorney-created and implemented strategy "[t]o facilitate [Old CertainTeed's] ability to pursue a section 524(g) resolution" in bankruptcy "without subjecting the entire. . . enterprise to chapter 11."[22] The Corporate Restructuring in turn, contemplated, and directly led to the Debtor's chapter 11 filing.[23]

---

[17] Starczewski Decl. ¶ 15; *see also* Bates Decl. ¶ 13.

[18] *See* Pl.'s Ex. 3 (summarizing the unresolved DBMP Asbestos Claim counts); Starczewski Decl. ¶ 13.

[19] Starczewski Decl. ¶¶ 14, 18.

[20] *Id.* at ¶¶ 11, 19.

[21] DBMP 30(b)(6) Dep. 62:21-63:8, 156:18-157:3 (Starczewski), Dec. 15, 2020.

[22] Project Horizon has been attributed to the general counsel of SGC. The law firm of Goodwin Proctor, CertainTeed's current counsel, was brought in early to assist with the project. Rayfield Dep. 103:7-12, Oct. 7, 2020; Starczewski Dep. 72:16-74:22, Oct. 1, 2020.

[23] *See* CertainTeed 30(b)(6) Dep. 62:2-7 (Campbell), Dec. 18, 2020 (describing Project Horizon as a "legal-driven process"); Placidet Dep. 49:22-50:3, Oct. 14, 2020 ("Project Horizon is a confidential project which basically was led by the lawyers to try to find a fair and global solution to the asbestos liability that we have with CertainTeed.").

39.     Project Horizon involved not only CertainTeed's upper management but also CertainTeed's ultimate parent company in North America, Saint-Gobain Corporation ("SGC").[24] As the Debtor's Rule 30(b)(6) witness put it, "Project Horizon was an analysis by the former CertainTeed Corporation, as well as its ultimate corporate parent, Saint-Gobain Corporation."[25]

40.     By at least February 2018, Old CertainTeed and SGC had begun discussions regarding Project Horizon.[26] By early 2019, Project Horizon had developed into a plan to isolate Old CertainTeed's asbestos liabilities in a new company, with minimal assets, that would file for bankruptcy.[27]

41.     Project Horizon was a closely guarded corporate secret. Before they could work on Project Horizon, CertainTeed employees were required to sign nondisclosure agreements.[28] The number of employees privy to Project Horizon was initially small but grew as Project Horizon took shape and required the involvement of additional personnel.[29] Even then, lower-echelon employees working on certain discrete parts of Project Horizon—such as "Project Sky"—were not informed of all facets of Project Horizon, such as the involvement of outside counsel, or that the Corporate Restructuring was being undertaken to address Old CertainTeed's asbestos liabilities.[30]

42.     During 2019, Project Horizon team meetings began and increased in frequency as the year went on.  As when these meetings began, several CertainTeed business

---

[24] DBMP 30(b)(6) Dep. 62:21-63:2 (Starczewski).
[25] *Id.*
[26] *See* DBMP 30(b)(6) Dep. 156:18-157:3 (Starczewski).
[27] *See* ACC-FCR Ex. 250.
[28] *See, e.g.,* ACC-FCR Ex. 66; ACC-FCR Ex. 139; see also Bondi Dep. 112:5-14, Oct. 9, 2020; CertainTeed 30(b)(6) Dep. 88:4-9 (Campbell).
[29] *See, e.g.,* ACC-FCR Ex. 66, at DBMP-BR_0150411; ACC-FCR Ex. 139; see also Bondi Dep. 112:15-22.
[30] CertainTeed 30(b)(6) Dep. 111:15-112:14 (Campbell).

managers learned for the first time about CertainTeed's experience in the tort system. The *Garlock* and *Bestwall* asbestos bankruptcies from this judicial district were among the topics of discussion.[31] There were discussions about how CertainTeed could end up paying less under a § 524(g) plan than it would if it continued paying asbestos claims as they arose in the tort system.[32]

43.     At each of these meetings, at least one attorney was present, either in-house counsel or someone from Goodwin Proctor or Jones Day.[33] The close involvement of attorneys in Project Horizon prompted CertainTeed's own corporate representative to acknowledge that Project Horizon was driven not by businesspeople, but by lawyers.[34]

44.     Old CertainTeed never entertained a bankruptcy filing for itself and all of its subsidiaries and affiliates (the "CertainTeed Enterprise"). This was a profitable going concern whose assets significantly outweighed its combined operating and asbestos liabilities. For such an enterprise, a bankruptcy filing would have serious negative consequences.

45.     Stephen Coulombe, a managing director with BRG, prepared two expert reports on the corporate restructuring and testified at the Hearing as to these negative consequences. Coulombe opined that a hypothetical CertainTeed bankruptcy filing in October 2019, would have had five primary detrimental business effects: (a) adverse financial impact on Old CertainTeed's trade creditors/vendors; (b) potential significant loss of sales and Old CertainTeed's customer base; (c) likely key personnel losses; (d) events of default under various financing agreements; and (e) incremental costs that would result from a significantly more

---

[31] Kinisky Dep. 112:13-24, 113:19-25, 114:6-10, Oct. 5, 2020; Bondi Dep. 92:7-17, 93:7-18.

[32] CertainTeed 30(b)(6) Dep. 217:16-24 (Campbell).

[33] *See, e.g.*, DBMP 30(b)(6) Dep. 79:8-25 (Starczewski); Kinisky Dep. 130:7-23, 134:5-9; Bondi Dep. 64:20-25, 77:25-78:6, 116:19-117:9(The presence of attorneys at these meetings has become a basis for numerous privilege assertions and instructions not to answer at the depositions of CertainTeed personnel in this proceeding when the Representatives sought to inquire about Project Horizon); *See, e.g.*, Rayfield Dep. 54:4-56:2 (at least 57 instructions not to answer during a less-than-seven-hour deposition); DiNenna Dep. 65:11-19, 96:9-97:8, Sept. 24, 2020.

[34] CertainTeed 30(b)(6) Dep. 62:2-7 (Campbell) (describing Project Horizon as a "legal-driven process"); Placidet Dep. 49:22-50:3.

complex bankruptcy filing. Coulombe was assessing the situation retrospectively, after this case was filed. However, the landscape would have appeared the same to Old CertainTeed's management and directors.

46.    Rather, than file Old CertainTeed or the CertainTeed Enterprise in bankruptcy, the Project Horizon plan was to isolate the asbestos liabilities in a single affiliated corporation and file it in chapter 11. That entity could then seek Section 524(g) injunctive relief shielding the CertainTeed Enterprise from Old CertainTeed's asbestos liabilities. This strategy had been previously employed in *Bestwall*, and it would thereafter be repeated in the *Aldridge* and *Murray* bankruptcy cases filed in this judicial district. In each of the four cases, the Debtor corporation was represented by the Jones Day law firm.

47.    DBMP says the proposed corporate restructuring was simply an option, one intended to provide Old CertainTeed additional "flexibility" to address its asbestos-related claims, potentially by a chapter 11 filed by some part of the enterprise.[35] In fact, the Debtor says that it made the decision to file bankruptcy independently of its parent and affiliates, and that decision was not made until January 23, 2020, the night before the case was filed. This contention is discussed below in Section II(E) and is rejected.

48.    Ultimately, Mark Rayfield, as Old CertainTeed's sole director, ultimately authorized the corporate restructuring, based on the information and advice he had received from the Project Horizon team.[36]

### D.  Implementing the Corporate Restructuring

49.    Old CertainTeed took advantage of a corporate restructuring procedure under Texas law to put all of its asbestos liabilities into one company, DBMP, and virtually all of

---

[35] Panaro 1st day Decl. ¶ 15
[36] Rayfield Decl. ¶ 9.

its assets and all of its non-asbestos liabilities, into another, New CertainTeed.[37] The Debtor's own documents describe the procedure as the "[s]plitting of CertainTeed legal entity . . . (Carving out two locations to isolate Asbestos liability)."[38]

50.    To this end, in July 2019, Old CertainTeed reserved the corporate name DBMP in North Carolina. On October 22, 2019, Old CertainTeed's direct parent, Saint-Gobain Delaware Corporation, formed CertainTeed Holding Corporation ("CT Holding") and contributed all the issued and outstanding stock of Old CertainTeed to CT Holding in exchange for full ownership of CT Holding.[39] That same day, Old CertainTeed converted from a Delaware corporation to a Delaware limited liability company.[40]

51.    Millwork & Panel LLC ("Millwork & Panel") was also formed as a direct subsidiary of Old CertainTeed. Old CertainTeed contributed a North Carolina bank account containing approximately $30 million and two manufacturing plants from its exterior siding and trim business—one based in Georgia and the other in Claremont, North Carolina—to Millwork & Panel.[41] The siding and trim business had several plants located throughout the country, but it was the North Carolina plant that had been earmarked in the Project Horizon deliberations as early as April 2019.[42] This would establish venue for a chapter 11 filing in the Western District of North Carolina.[43]

---

[37] ACC-FCR Ex. 369 (Project Horizon: Splitting of CertainTeed legal entity CRT (Carving out two locations to isolate Asbestos liability)).
[38] *Id.*
[39] Panaro Decl. ¶ 16.
[40] *Id.*
[41] *Id.*
[42] ACC-FCR Ex. 138, at DBMP-BR_0150417; Bondi Dep. 40:2-21; 85:15-23; 91:10-92:6.
[43] DBMP 30(b)(6) Dep. 31:17-23 (Bondi), Dec. 22, 2020 ("Q. The selection of the Claremont [NC] plant to be contributed to Millwork & Panel, that was done in order to give DBMP the option of filing in North Carolina, filing chapter 11 in North Carolina, if it chose to do so. A. That's correct."). Claremont is in Catawba County, one of the 32 counties comprising the Western District. Presumably, the attraction to this judicial district stems from Judge Hodges' groundbreaking claims estimation decision in *Garlock* and the injunctive relief provided in *Bestwall*.

52.     On October 23, 2019, at 9:00 a.m. Central Time, Old CertainTeed converted to a Texas limited liability company.[44] A half-hour later, Old CertainTeed effected a divisional merger under Chapter 10, Subchapter A of the Texas Business Organizations Code (the "TBOC"). Old CertainTeed split itself into two Texas limited liability companies: New CertainTeed and DBMP.[45] Old CertainTeed ceased to exist.

53.     Under the Plan of Divisional Merger, New CertainTeed received approximately 97% of former CertainTeed's assets, most of Old CertainTeed's operations, and all of its employees. Only 3% of the Old CertainTeed assets were allocated to the Debtor.[46] Among these, the Debtor received approximately $25 million in cash, the equity interests in Millwork & Panel, Old CertainTeed's contracts related to asbestos litigation, and rights under a Funding Agreement, described below.[47] Apart from its Millwork & Panel subsidiary, the Debtor received no operating business or employees. DBMP was but a holding company.

54.     Meanwhile, the Plan of Divisional Merger allocated all of Old CertainTeed's asbestos liabilities to the Debtor and, as described below, also purported to obligate DBMP to indemnify New CertainTeed and hold it harmless from and against "all losses" relating to those liabilities.[48]

---

[44] ACC-FCR Ex. 213, at DBMP-BR_0001808.

[45] ACC-FCR Ex. 214.

[46] *See* ACC-FCR Ex. 27, § 5(b)(ii) ("Plan of Divisional Merger"); Hr'g Tr. 155:16-156:5, Mar. 1, 2021 ("PI Hr'g Tr.").

[47] Panaro CT Holding ¶ 18. Apart from his "First Day" declaration, the Debtor's Chief Restructuring Officer—Robert Panaro also submitted a declaration in this Adversary Proceeding, which claims that estimates, as of December 31, 2020, reflect that the Debtor's value rose to an estimated $274 million. Declaration of Robert J. Panaro ¶ 21, ECF No. 238, p. 74. This value was calculated by adding "the Debtor's cash [to] the value of its ownership of Millwork & Panel," which was calculated by "multiplying Millwork & Panel's EBITDA (or projected EBITDA) for the year by eight." *Id.* Thus, this valuation is simply an aggregation of the Debtor's estimated assets. It does not take into account the Debtor's liabilities. So, absent the Funding Agreement the Debtor remains more than $300 million underwater even under its own estimate of asbestos liabilities.

[48] Plan of Divisional Merger §§ 5(c)(i), 9(b).

55.     At 10:00 a.m. Central on October 23, 2019, New CertainTeed converted to a Delaware limited liability company.[49] At 12:49 p.m. Central that same day, DBMP converted to a North Carolina limited liability company.[50] In total, New CertainTeed and the Debtor were Texas entities for less than four hours.[51]

56.     Thus, in a matter of hours and without notice to any of its asbestos creditors, Old CertainTeed separated virtually all of its business, assets, and employees from its asbestos liabilities, transferring those liabilities to DBMP. This enabled Old CertainTeed to reach its goal of placing its asbestos liabilities into bankruptcy without the entire enterprise filing for chapter 11.

57.     While we do not here estimate Old CertainTeed's asbestos liability, it should be noted that on Old CertainTeed's publicly disclosed financial statements, its assets greatly exceeded its combined operating and asbestos liabilities.[52] Old CertainTeed had almost $3 billion in assets and less than half of that in all liabilities.[53] By contrast, and disregarding the Funding Agreement (described below), DBMP's assets were not then, and are not now, sufficient to satisfy its liabilities.[54]

---

[49] *See* PI Hr'g Tr. 155:3-156:14.
[50] ACC-FCR Ex. 218, at DBMP-BR_0003527; ACC-FCR Ex. 216, at DBMP-BR_0003330. There were other associated corporate restructuring steps. To avoid needless confusion, we mention only the most salient of these.
[51] *Compare* ACC-FCR Ex. 213, at DBMP-BR_0001808, *with* ACC-FCR Ex. 216, at DBMP-BR_0003330, *and* ACC-FCR Ex. 218, at DBMP-BR_0003527.
[52] ACC *See* PI Hr'g Tr. 155:3-156:14.
[53] *See* PI Hr'g Tr. 155:3-156:14; Diaz Expert Report at ¶ 17.
[54] *See id.* at 155:15-24.

58.    Table 1 below depicts, in condensed form, the organizational structure before and after the Corporate Restructuring:



59.    Undertaking such a Corporate Restructuring followed almost immediately by one of the two newly created entities filing bankruptcy is an unorthodox strategy.[55]  Other than a few recently filed asbestos bankruptcies (of which four are presently pending in this District), we are unaware of any precedent or business reason for such a transaction.[56]

60.    Since the completion of the Corporate Restructuring, New CertainTeed has continued to manufacture and sell the building products historically sold by Old CertainTeed.[57] New CertainTeed also continues to pay non-asbestos creditors in the ordinary course.[58]

---

[55] PI Hr'g Tr. 164:21-167:2, 182:12-183:3.
[56] Id. at 180:3-8.
[57] See Panaro Decl. ¶ 13.
[58] CertainTeed 30(b)(6) Dep. 126:2-9 (Placidet); Placidet Dep. 181:17-21; PI Hr'g Tr. 160:15-20.

61.     DBMP and New CertainTeed have been frank about what transpired in the Corporate Restructuring and, to a certain extent, as to why these actions were undertaken.[59] Despite the apparent inequities, each steadfastly maintains that the 2019 Corporate Restructuring was designed to ensure that DBMP "has the same ability to fund the costs of defending and resolving present and future asbestos claims, both in the state and federal courts and in connection with any chapter 11 filing as [former CertainTeed]."[60] This assertion is premised upon several intercompany agreements which were inked in conjunction with the Corporate Restructuring.

### E.   Intercompany Agreements

62.     In contemplation of the Divisional Merger, Old CertainTeed drafted and purported to make several agreements as between the yet to be formed DBMP and New CertainTeed, as well as other agreements between its prospective successors and certain of the Other Affiliates.[61] These agreements were dated "as of" October 23, 2019, the day of the Texas divisional merger. These agreements purport to establish the contractual relationships and obligations as between Old CertainTeed's two prospective successors and between them and the other members of the CertainTeed Enterprise.

63.     These Agreements are not "arm's length" contracts. They were "negotiated" by Old CertainTeed and CertainTeed Holding Corp., for application to two companies that did not, at that moment, exist. The agreements were then revised and ratified by New CertainTeed, through signatories who held positions with both entities and/or their parent.

---

[59] As noted, the same officers and directors of Old CT, are the officers and directors of New CertainTeed. The Debtor has no employees of its own, but certain officers of SGC, New CertainTeed's US parent, work for the Debtor under the Secondment Agreements discussed below. Thus, the Debtors and New CertainTeed speak with one voice.
[60] Panaro Decl. ¶12, 15; Starczewski Decl. ¶ 20; Rayfield Decl. ¶¶ 10–11.
[61] To avoid confusion, we will use the names of the intended signatory companies when referencing these agreements.

For example, DBMP executed the Funding Agreement by signature of Joseph Bondi, an officer

of both DBMP <u>and</u> New CertainTeed.[62]  Given the insider relationships and conflicts of interest,

the legal enforceability of these agreements vis a vis third parties is doubtful.[63]

64.    The most pertinent of these agreements are as follows:

i.    <u>The Funding Agreement</u>

65.    The Funding Agreement is central to DBMP's assertion that it has the

same ability as Old CertainTeed to pay the DBMP Asbestos Claims.[64]  This is so because New

CertainTeed has committed to give DBMP the necessary money, at the appropriate time.

66.    More particularly, the Funding Agreement provides, *inter alia*, that current

CertainTeed will transfer funds to the Debtor to pay any "Permitted Funding Use."[65] The term

"Permitted Funding Use" includes (a) the costs of administering the Debtor's Chapter 11 Case, (b)

amounts necessary to satisfy the Debtor's "Asbestos Related Liabilities" in connection with

funding a § 524(g) trust, and (c) the Debtor's indemnification obligations to CertainTeed under

any agreement provided for in the Plan of Divisional Merger.[66]

67.    The Funding Agreement is not a loan. It imposes no repayment obligations

on the Debtor.[67] Nor is it capped.

---

[62] Bondi Decl.; *See generally* Amended and Restated Funding Agreement; *See* Section II(E), below.
[63] *Schmoll v. AC and S, Inc.*, 703 F. Supp. 868, 874 (D. Or. 1988), aff'd, 977 F.2d 499 (9th Cir. 1992) (Court will disregard corporate transactions which, while meeting technical legal requirements, were designed with the improper purpose of escaping asbestos-related liabilities and would not have been undertaken in an arm's length transaction)
[64] *See, e.g.*, DBMP 30(b)(6) Dep. 165:12-17, 196:13-19, 199:15-18, 202:11-19 (Starczewski); Starczewski Dep. 226:17-227:5, 246:18-247:6, 264:13-265:5.
[65] Funding Agreement § 2.
[66] *Id*. at 5-6.
[67] Panaro Decl. ¶ 16; Rayfield Decl. ¶ 12.

68.     However, the Funding Agreement is not an unconditional promise by New CertainTeed to pay the DBMP Asbestos Claims, either.  First of all, CertainTeed is obligated to bankroll the chapter 11 administrative expenses and pay the Debtor's indemnification obligations <u>only if</u> the cash distributions from Millwork & Panel are insufficient to pay those expenses and obligations in full.[68] CertainTeed is obligated to fund a § 524(g) trust <u>only if</u> the Debtor's "other assets are insufficient to fund amounts necessary or appropriate to satisfy . . . Asbestos Related Liabilities in connection with the funding of such trust."[69]   The Funding Agreement is a backstop. Arguably, DBMP would have to spend all of its distributions before it can pay administrative expenses and would have to liquidate before it could secure funding for a plan.

69.     Second, the funding commitment is made by New CertainTeed <u>to DBMP</u>, and not to the asbestos claimants.  Only DBMP can enforce the agreement.  One wonders how DBMP could ever do so unless New CertainTeed wanted the Funding Agreement enforced. Apart from being sister corporations, DBMP has no employees of its own. As discussed below, its employees are borrowed from SGC, the parent company of both DBMP and New CertainTeed. Thus, the people who would have to enforce the agreement on behalf of DBMP against New CertainTeed are officers and employees of SGC, the corporate parent of both companies.

70.     Moreover, the Funding Agreement limits CertainTeed's funding obligations to costs and expenses that are "necessary or appropriate"[70] but fails to specify the types of items that qualify. This creates uncertainty as to whether a particular funding request would be granted or denied. There is no dispute resolution mechanism if a funding request by the Debtor is denied.[71]

---

[68] *Id*. at 6.
[69] *Id*.
[70] Funding Agreement at 5 (definition of "Permitted Funding Use").
[71] *See generally* Funding Agreement.

71.     Further, the Funding Agreement may only be assigned with consent of the counterparty.[72] Therefore, in this case arguably the Funding Agreement could not be assigned to a trust under a creditor Plan and that Plan could not be funded—unless New CertainTeed favors that Plan.

72.     And as a condition of funding any Plan by which asbestos claimants might be paid, New CertainTeed must receive relief under Section 524(g). Whether New CertainTeed is entitled to such relief is an open question.[73]

73.     In short, in order for DBMP to be able to fund a plan in this case, both asbestos claimants (by a 75% vote) and this Court must agree to New CertainTeed receiving the benefits of a Section 524(g) injunction.    Otherwise, DBMP has no ability to pay the asbestos claimants.

74.     In sum, while the Funding Agreement may provide funding for a plan, it will do so only if New CertainTeed favors that Plan.    And that favor is dependent on New CertainTeed receiving permanent injunctive relief from the DBMP Asbestos Claims—whether it is entitled to it or not.

75.     DBMP's ability to obtain funding under the Funding Agreement is also dependent on New CertainTeed's continued viability. While New CertainTeed is a prosperous corporation, these obligations are not secured by New CertainTeed's assets. They are not guaranteed by any of the Saint-Gobain parent companies or other Protected Parties.[74] And nothing

---

[72] PI Hr'g Tr. at 157:21-162:4.

[73] The Representatives argue that New CertainTeed does not fall within the enumerated categories of Section 524(g)(4)(a)(ii) and is therefore ineligible for injunctive relief.

[74] See, e.g., CertainTeed 30(b)(6) Dep. 213:24-214:16 (Campbell); Starczewski Dep. 236:24-237:15; PI Hr'g Tr. 3/1/21 158:13-159:1.

in the Funding Agreement prevents New CertainTeed from adding debt that would be senior in priority to its obligations in the Funding Agreement.[75]

76.     Similarly, there is no limit on New CertainTeed's ability to forgive material obligations owed to it by SGC, Saint-Gobain Finance Corporation ("SG Finance"), and other affiliates.[76] The Funding Agreement also allows New CertainTeed to engage in consolidations and mergers, and to transfer "all or substantially all" of its assets.[77] Nothing in the Funding Agreement purports to limit or bar New CertainTeed's ability to pay dividends to its parent company, CT Holding.[78]

77.     In sum, the Funding Agreement is not an unconditional promise to pay the DBMP Asbestos Liabilities. It is instead a conditional agreement which is dependent on New CertainTeed's approval of any reorganization plan and upon New CertainTeed's continued good financial health.

<ins>ii.     The Support Agreement</ins>

78.     The Support Agreement is between the Debtor and New CertainTeed.[79] It, too, was drawn and executed by the two companies' predecessor(s) and then assigned and ratified by DBMP and New CertainTeed.[80] Among other things, the Support Agreement requires the Debtor to indemnify New CertainTeed and hold it harmless from and against all asbestos-related "Losses" and "Proceedings" to which New CertainTeed "may become subject."[81] Incongruously,

---

[75] *See generally* Funding Agreement; *see* PI Hr'g Tr. 159:12-14.
[76] *See generally* Funding Agreement; PI Hr'g Tr. 159:9-10.
[77] If "all or substantially all" of CertainTeed's assets are transferred, the Funding Agreement contemplates that the transferee will assume CertainTeed's obligations thereunder. *Id*. When questioned on this clause in deposition, at least one witness could not quantify the proportion of CertainTeed assets—whether it be 50% of the assets, 80%, or 99%—that would constitute "substantially all" of its property. *See* Bondi Dep. 222:13-20, 224:4-230:18.
[78] *See generally* Funding Agreement; PI Hr'g Tr. 159:8-9; DBMP 30(b)(6) Dep. 189:15-21 (Starczewski).
[79] *See* ACC-FCR Ex. 33, Am. and Restated Divisional Merger Support Agreement ("Support Agreement").
[80] *Id.*
[81] *Id*. ¶ 3.

DBMP the entity which received few of Old CertainTeed's assets but all of its asbestos liabilities is charged with protecting the sister company which inherited almost all of Old CertainTeed's assets, its operations[82] and its employees, from Old CertainTeed's asbestos liabilities.

79.    Adding to the irony, if the cash distributions from Millwork & Panel are insufficient to allow the Debtor to pay its indemnification obligations to New CertainTeed under the Support Agreement, the Funding Agreement provides that New CertainTeed will provide the funds to the Debtor so that the Debtor, in turn, may indemnify New CertainTeed.[83]

80.    The Support Agreement's indemnity provision, when coupled with the Funding Agreement, creates a potential circular transfer of funds between the Debtor and New CertainTeed. If the Debtor's cash flow is insufficient, New CertainTeed is required to provide DBMP with the funds that DBMP would then use to pay any indemnity it allegedly owes to New CertainTeed, on the effective date of a confirmed chapter 11 plan.

81.    Thus, the Support Agreement is an unorthodox transaction with no apparent business purpose apart from aiding this bankruptcy case and securing injunctive relief for the Protected Parties.

iii.    The Secondment Agreement

82.    Intending that DBMP would have no employees of its own, Old CertainTeed drew a Secondment Agreement for DBMP with SGC, whereby five individuals would be loaned to the Debtor to work as employees.[84]

---

[82] The Support Agreement also specifies that the Debtor and New CertainTeed are each a "disregarded entity for U.S. federal income tax purposes" and that "the Divisional Merger will be disregarded" for federal tax purposes. Under the agreement, New CertainTeed retained the federal employer identification number (EIN) of Old CertainTeed. The Debtor, however, is required to obtain "a new EIN, if and when it is required by Law."

[83] Funding Agreement at 6 (clause (e) in definition of "Permitted Funding Use"); DBMP 30(b)(6) Dep. 202:5-10 (Starczewski).

[84] ACC-FCR Ex. 31 ("Secondment Agreement").

83.     That DBMP was created with no employees and no operations reflects its single purpose: the Debtor was a vessel designed to ferry Old CertainTeed's asbestos liabilities into bankruptcy.   This lack of employees appears intended to set up the argument in a then contemplated, now existing, bankruptcy case that a preliminary injunction is necessary to avoid overwhelming the Debtor's employees.

iv.     The Millwork & Panel Agreements

84.     Through Old CertainTeed, DBMP also entered into a Contribution Agreement, a Sales and Marketing Agreement, an IP License Agreement, and a Secondment Agreement with Millwork & Panel.

85.     Under the Secondment Agreement, all of Old (now New) CertainTeed's employees working at the North Carolina and Georgia plants that were transferred to Millwork & Panel have been seconded to Millwork & Panel.[85] Post-merger, New CertainTeed is Millwork & Panel's only customer.[86] The prices by which Millwork & Panel provides its goods to New CertainTeed (for subsequent resale to CertainTeed customers) are fixed under the Sales and Marketing Agreement. Effectively, Millwork & Panel is another entity established by Old CertainTeed for the purposes of this bankruptcy case. While theoretically the Debtor's subsidiary, Millwork & Panel, is dependent on New CertainTeed.

**E.  Post Corporate Restructuring, Pre-Bankruptcy.**

86.     With no employees or operations, DBMP's activities have been limited to managing its asbestos liabilities and overseeing its equity interest in Millwork & Panel.

---

[85] DBMP 30(b)(6) Dep. 33:19-23 (Bondi).
[86] *Id*. at 34:8-10; Bondi Dep. 38:2-8.

87.     As to corporate governance, DBMP's Board of Managers (the "DBMP Board" or the "Board") is comprised of Joseph Bondi, Sean Knapp, and Lawrence Rayburn. Bondi and Knapp are employees of SGC, the parent company of both New CertainTeed and the Debtor. Rayburn is not employed by SGC or any other affiliate of the Debtor.[87]

88.     Bondi serves as DBMP's and Millwork & Panel's president, as well as a Vice President of New CertainTeed.[88] Knapp is Chief Financial Officer and Vice President of the Debtor, as well as Millwork & Panel.[89] Vincent DiNenna III is DBMP's Treasurer as well as Assistant Treasurer of SGC and New CertainTeed.[90] Donald J. Melroy is Assistant Treasurer of DBMP, of SGC and of New CertainTeed.[91] Robert J. Panaro is DBMP's Chief Restructuring Officer and Vice President as well as Senior Vice President and Chief Operating Officer of SGC.[92] Michael Starczewski is DBMP's Vice President, Secretary, and Chief Legal Officer.[93]

89.     DBMP was initially staffed by five seconded SGC employees. These individuals were Starczewski, the Debtor's Chief Legal Officer, and four others.[94] These five individuals essentially comprised an in-house legal team for the Debtor.

90.     Since the Petition Date, two of these individuals have left SGC and no longer work for the Debtor.[95] Only one, Starczewski, is a full-time employee. The other two individuals are an attorney and an administrative assistant who devote one-third of their time or less to the Debtor.[96]

---

[87] Starczewski Decl. ¶ 25; *see also* Bondi Decl. ¶¶ 7, 8.
[88] Bondi Dep. 32:10-14.
[89] Knapp Dep. 20:18-21:5.
[90] DiNenna Dep. 22:19-25.
[91] Melroy Dep. 12:23-25, 20:2-10, Oct. 8, 2020.
[92] Panaro Dep. 40:9-21, 43:7-22, Oct. 6, 2020.
[93] Starczewski Decl. ¶ 25; Bondi Decl. ¶¶ 8, 9.
[94] Bondi Decl. ¶ 10.
[95] DBMP 30(b)(6) Dep. 108:2-5, 113:11-16 (Starczewski); ACC-FCR Ex. 188 (Letter from Jeffrey B. Ellman to Kevin C. Maclay, at 3 (June 9, 2020)) ("Ellman Letter").
[96] ACC-FCR Ex. 188, Ellman Letter, at 2-3.

    i.    DBMP's Board of Managers Meets and Considers Options to Address Asbestos Liabilities

91.    On January 23, 2020 (or 91 days after its creation), the Debtor filed chapter 11 in this bankruptcy court.

92.    In that short period, the DBMP Board met six times.[97] DBMP insists that the decision to file bankruptcy was made only at the last of these meetings, the one on January 22, 2020.[98] Thus, according to the Debtor, its decision to file was reached the night before the bankruptcy petition was in fact filed.[99]

93.    DBMP suggests that during this three month period, DBMP's Board members " … familiarized themselves with their duties and responsibilities, received information concerning the financial performance and condition of DBMP and its operating subsidiary, Millwork & Panel, and assessed the historical and current efforts and challenges involved in, and the financial and other burdens associated with, the defense of the DBMP Asbestos Claims."[100] DBMP suggests that with input from legal counsel who attended these meetings, its Board thoroughly considered its options, and over a period of time came to the conclusion that a bankruptcy filing was its (and the asbestos claimants) best course of action.[101]

94.    DBMP's statements tie in to two other Debtor contentions: first, that the Corporate Restructuring was intended only to provide the Debtor with "flexibility" in dealing with its asbestos liabilities and that a bankruptcy filing by DBMP was simply one of those options. Second, that the DBMP Board made the decision to enter bankruptcy independently of Old CertainTeed or New CertainTeed. Both suggestions are contrary to the evidence and are rejected.

---

[97] Starczewski Decl. ¶¶ 26-32.
[98] Starczewski Decl. ¶ 32.
[99] *See* Pl.'s Ex. 36; Starczewski Decl. ¶¶ 26-33.
[100] Bondi Decl. ¶ 12.
[101] *See, e.g.,* Starczewski Decl. ¶¶ 26-32; Pl.'s Exs. 29-30, 32-35 (Board minutes).

95.     The first problem with these assertions is that they are largely untested. Even as the DBMP and New CertainTeed officer and director witnesses offered selective testimony in their depositions about the Corporate Restructuring and the decision to file bankruptcy, the Debtor and New CertainTeed interposed attorney client and work product privilege assertions to block a fulsome inquiry by the Representatives about these matters.

96.     Shortly before the Hearing, the Representatives filed motions to compel and sought emergency hearings seeking to obtain this information. Due to the limited time period between the depositions in which these privilege assertions were made and the Hearing, a full-blown motion to compel hearing was untenable. Literally thousands of documents were at issue and hundreds of privilege objections had been asserted. Given this, the Representatives found it necessary to abandon their motion to compel in favor of seeking to exclude the proffered witness testimony at hearing, on the assertion that the privileges were being improperly employed by the Debtor and New CertainTeed as both 'shield and sword.'

97.     Many of these matters appear in fact privileged and the assertions were proper, but for the fact that DBMP and New CertainTeed's corporate representatives proceeded to testify about the same topics—to the extent that they found it advantageous.

98.     Obviously, DBMP and new CertainTeed cannot have it both ways. The attorney client and work product privileges may not be used as both shield and sword.[102] Thus, a waiver might have been found. However, here we have the unusual circumstance where this testimony was submitted, not in open court through live testimony where objections could be made and ruled upon as presented, but instead in a virtual proceeding through a hodgepodge of declarations, deposition transcripts, and written discovery responses.  And there is a timing aspect

---

[102] *See generally Tackett v. State Farm Fire & Cas. Ins. Co*., 653 A.2d 254, 259 (Del. 1995); *Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 419 (Del. 2010).

to this: these two Motions are time sensitive matters whose resolution had already been greatly delayed.

99.    Instead of further delaying matters to reopen discovery, potentially compel testimony, and reopen the evidentiary record to introduce the same, we will instead disregard the self-serving witness testimony proffered by the DBMP and New CertainTeed witnesses as to these matters, to the extent it is inconsistent with other available evidence as to what these corporations did, and the inferences that flow from their actions.

100.    As to that evidence, by early 2018 Old CertainTeed had learned of the *Bestwall* case and was investigating whether it too could place its asbestos liabilities in a new company that would file for bankruptcy. By June 5, 2019, Old CertainTeed began preparations for such a bankruptcy filing when the Jones Day bankruptcy team was brought in.[103]

101.    What DBMP did in the Corporate Restructuring, the Divisional Merger, and then the follow-on bankruptcy filing of DBMP closely paralleled the three other asbestos bankruptcy cases filed by the Jones Day law firm in this judicial district—*Bestwall*, *Aldrich* and *Murray*. In each case, a successful corporate enterprise with substantial asbestos liabilities briefly reincorporated in Texas and then divided itself in two under the Texas Divisional Merger statutes. This led to two companies, one with limited assets and all of the old company's asbestos liabilities, the other with most of the enterprise assets, employees, and operations. The stated purpose of these actions for each corporation was to permit the asbestos bearing successor company the "option" to file bankruptcy. In short order each of these companies did in fact file bankruptcy, and immediately sought to provide injunctive relief and the benefits of Section 524(g) to its non-filing sibling. In each case, under a Funding Agreement, the healthy twin agrees to fund a plan,

---

[103] *See* ACC-FCR Ex. 226.

conditioned on it receiving Section 524(g) relief.

102.    While both Old CertainTeed and DBMP have said that bankruptcy was but one of several options, that strains credibility.  In the first place, it is most unlikely that a large corporate concern such as Old CertainTeed would undertake the considerable expense and disruptions of the Corporate Restructuring unless it intended that DBMP file the bankruptcy that the Corporate Restructuring was intended to facilitate.

103.    As to entertaining other options, during the Debtor's Board meeting held on December 20, 2019, Starczewski as Chief Legal Officer presented the company's three alternatives. The first, continuing to defend DBMP Asbestos Claims in the tort system, was not really an option. That was the status quo.  The only options were whether to (a) seek a transfer of the DBMP Asbestos Claims liability to a third party; or (b) file a chapter 11 case in anticipation of treating the asbestos liabilities under a Section 524(g) trust.[104]

104.    On the evidence available to us, it does not appear that anyone seriously considered a transfer of liabilities to a third party.  If this was an option, Old CertainTeed could have employed it in lieu of the Corporate Restructuring. This would have been much less disruptive than the Corporate Restructuring. Further, by virtue of the Texas Divisional Merger, Old CertainTeed had already isolated its asbestos liabilities in a separate corporation, DBMP. There would be no reason to further separate those asbestos liabilities from the CertainTeed Enterprise by transferring them to a third company.

105.    This leaves bankruptcy as the only viable option. At his deposition, Lawrence Rayburn, a member of the Debtor's board of managers, testified that apart from CertainTeed remaining in the tort system, he could not recall any option on the table other than a

---

[104] *See, e.g.,* Starczewski Decl. ¶¶ 26-32; Pl.'s Exs. 29-30, 32-35 (Board minutes).

bankruptcy filing.[105] Doubtless, this is the truth of the matter.

106.    So, while technically, the DBMP Board approved the formal resolution authorizing a bankruptcy filing by this company only on January 22, 2020, the decision that this newly formed corporation would file chapter 11 was made before the Corporate Restructuring and before the Debtor existed.[106]

       ii.    <u>Post-Merger New CertainTeed</u>.

107.    After the Merger and through the present time, New CertainTeed, has continued almost all of Old CertainTeed's business producing the same products, using the same executive management team, and operating out of the same facilities as Old CertainTeed. Project Horizon has had no net effect on New CertainTeed's business.[107]

108.    To this point, New CertainTeed has performed under the Funding Agreement. As of February 18, 2021, DBMP has made requests for funding—mostly the administrative costs of DBMP's bankruptcy case—in the aggregate amount of $64.5 million; all such requests have been funded by New CertainTeed.[108]

109.    New CertainTeed has also stated its commitment to comply with its future contractual obligations under the Funding Agreement, including meeting DBMP's contractually authorized funding requests to provide funding for a section 524(g) trust as established under a confirmed plan of reorganization in the Chapter 11 Case.[109] To the extent that this happens, New CertainTeed has the financial ability to satisfy these obligations as evidenced by New CertainTeed's considerable owners' equity and profitable operations.

---

[105] Rayburn Dep. 135:11-136:5, Sept. 28, 2020.
[106] Old CertainTeed had begun preparations for this bankruptcy by at least June 5, 2019, when the Jones Day bankruptcy team was brought in. *See* ACC-FCR Ex. 226.
[107] Rayfield Dep. 81:8-25; ACC-FCR Ex. 250.
[108] Rayfield Decl. ¶ 13.
[109] *Id.* at 13, 14.

### iii.    Post-Merger Suits Against New CertainTeed and Others

110. Following the 2019 Corporate Restructuring, individual asbestos claimants began (a) naming New CertainTeed and/or other non-debtor Other Affiliates of the Debtor as defendants in newly filed DBMP Asbestos Claims or (b) adding or seeking to add New CertainTeed as a defendant in previously filed DBMP Asbestos Claims.[110] More than 170 complaints or amended complaints asserting DBMP Asbestos Claims against New CertainTeed and/or other non-debtor affiliates of the Debtor during the roughly three-month period between the 2019 Corporate Restructuring and the January 23, 2020 bankruptcy filing.[111]

111. Another 40 complaints or amended complaints were filed against New CertainTeed and Other Affiliates of the Debtor after the Petition Date.[112]

112. At least one such complaint pleads an alter ego theory of recovery against New CertainTeed. Others seek to recover DBMP Asbestos Claims against New CertainTeed by alleging that the 2019 Corporate Restructuring is a fraudulent conveyance.[113]

113. The number of DBMP Asbestos Claims already initiated against New CertainTeed and other Protected Parties after the 2019 Corporate Restructuring confirms that absent injunctive relief, the asbestos-related litigation in the tort system would recommence and continue as before the chapter 11 filing.[114]

114. Indeed, the stated reason for the Representatives' opposition to the injunctive relief sought here is to enable asbestos claimants to recommence suing New CertainTeed and potentially the Other Affiliates and Distributors for DBMP Asbestos Claims.[115]

---

[110] Starczewski Decl. ¶ 38.
[111] *Id.* at 39.
[112] *See* Pl.'s Ex. 4 (compilation of exhibits); Pl.'s Ex. 5 (copies of complaints filed by members of the ACC against Old CertainTeed or DBMP and other defendants); *see also* Starczewski Decl. ¶ 39.
[113] Starczewski Decl. ¶ 40.
[114] *Id.* at ¶ 46.
[115] *See generally* ACC Objection; FCR Objection.

### III.    CONCLUSIONS OF LAW

#### A.    Jurisdiction and Venue

115.    Although the Representatives argue otherwise, this Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §1334.

116.    More specifically, a bankruptcy court has "jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11," 28 U.S.C. § 1334(b). All three statutory bases pertain and provide subject matter jurisdiction to enjoin third-party litigation under the circumstances presented.

117.    First, "arising under" jurisdiction exists. A proceeding "aris[es] under" the Bankruptcy Code if it "invokes a substantive right created by the Bankruptcy Code."[116] The Debtor's request for declaratory relief aims to confirm the scope of the automatic stay, "a substantive right created by [section 362 of] the Bankruptcy Code."[117]

118.    "Arising under" jurisdiction also exists in that the Debtor is seeking a section 105(a) injunction in aid of the automatic stay (to the extent it does not apply by its own force). Under the Texas Divisional Merger Statutes and the merger documents, all of the Old CertainTeed asbestos claims were exclusively allocated to the Debtor. As discussed below, that merger and the liability allocations themselves are subject to potential legal challenge. However, at the moment, these asbestos claims are exclusively "claims against the debtor and therefore impair the automatic stay."[118]

---

[116] *FPSDA II, LLC v. Larin (In re FPSDA I, LLC)*, No. 10-75439, Adv. No. 12-08032, 2012 WL 6681794, at *4 (Bankr. E.D.N.Y. Dec. 21, 2012), *as corrected* (Dec. 26, 2012).
[117] *See A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999-1000 (4th Cir. 1986); *In re Brier Creek Corporate Ctr. Assocs. Ltd.*, 486 B.R. 681, 685 (Bankr. E.D.N.C. 2013).
[118] *Chase Manhattan Bank (N.A.) v. Third Eighty-Ninth Assocs. (In re Thirty Eighty-Ninth Assocs.)*, 138 B.R. 144, 147 (S.D.N.Y. 1992).

119.    Second, as we discuss below in Section III(D), while the merger and the allocations between DBMP and New CertainTeed may be challenged as fraudulent transfers[119] or under remedial doctrines like alter ego and successor liability, with DBMP in bankruptcy, the challenge may not be made by individual creditors. The applicable remedial causes of action are estate property under Code Section 541 or else fraudulent transfer claims under Sections 544 and 548 that must be asserted by the bankruptcy trustee for the benefit of all creditors, under the Fourth Circuit's "first crack" theory.  Under 28 U.S.C. 1334(e)(1), this Court has exclusive jurisdiction over all property of the debtor as of the commencement of the case, and over all estate property.

120.    Finally, there is a close nexus between the injunction sought by DBMP and the substantive rights created by the automatic stay. "[C]ommon sense indicates that, if the Court has subject matter jurisdiction over a proceeding to determine the applicability of the automatic stay" as it does here, "then it has jurisdiction over a related motion for preliminary injunctive relief" in the same  proceeding.[120]

121.    "Arising in" jurisdiction also exists.  The Debtor's request for injunctive relief under section 105(a) is unique to bankruptcy. A proceeding "arises in" a bankruptcy case when it "would have no existence outside of the bankruptcy."[121]  A claim for such an injunction, tied to and lasting only during a bankruptcy case, meets this standard. "The debtor[] would not be entitled to a § 105 injunction but for the existence of [its] bankruptcy case[]."[122]

---

[119] The Corporate Restructuring occurred through a series of transactions that occurred within hours and, in some cases, within days of one another. However, "[c]ourts have 'collapsed' a series of transactions into one transaction when it appears that despite the formal structure erected and the labels attached, the segments, in reality, comprise a single integrated scheme when evaluated focusing on the knowledge and intent of the parties involved in the transaction." *In re Abell*, 549 B.R. 631, 660 (Bankr. D. Md. 2016) (alteration in original) (quoting *In re Sunbeam*, 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002)).

[120] *FPSDA I, LLC*, 2012 WL 6681794, at *5 (quoted in *Brier Creek*, 486 B.R. at 685).

[121] *Bergstrom v. Dalkon Shield Claimants Tr. (In re A.H. Robins Co., Inc.),* 86 F.3d 364, 372 (4th Cir. 1996); accord *Grausz v. Englander,* 321 F.3d 467, 471 (4th Cir. 2003).

[122] *Brier Creek,* 486 B.R. at 685.

122.    Third, and "at a minimum, [this court has] 'related to' jurisdiction" over these disputes.[123] "Related to" jurisdiction over third-party claims lies when "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy."[124]

123.    As we discuss below in Section III(C), litigation of the DBMP Asbestos Claims against the Protected Parties outside of this case could "conceivably have [an] effect" on the Debtor's estate and reorganization.

124.    The FCR also argues that this Court lacks jurisdiction over this action because the underlying DBMP Asbestos Claims against New CertainTeed are "direct" claims— meaning they assert asbestos claims against non-debtors that exist outside of bankruptcy. However, by virtue of the Texas Merger statutes and merger documents, those asbestos claims are, at least for now, exclusively the Debtor's obligations.[125] Liquidating those claims elsewhere even as the Debtor seeks to resolve them in this bankruptcy case, undoubtedly "affects" this estate, to say nothing of potentially creating claims of indemnity as against DBMP and possibly binding it under preclusion doctrines.

125.    Further, and as we discuss below in Section III(C) and (D), the apparent deleterious effects of the Corporate Restructuring and Divisional Merger would affect all asbestos claimants. Post-merger, the only way that these tort claims themselves might be asserted against third parties like New CertainTeed would be through remedial equitable doctrines like alter ego and successor liability, or by attacking them as fraudulent transfers.

---

[123] *Id.* at 686.

[124] *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984); *see Robins*, 788 F.2d at 1002, 1002 n.11.

[125] Again, nominally, but subject to challenge of the merger itself.

126.    Again, the aforementioned equitable remedy claims by which the asbestos claimants would hold the Protected Parties liable are themselves estate property. And due to the pendency of this bankruptcy case, any fraudulent transfer claims must in the first instance be pursued by the bankruptcy trustee. Permitting an individual creditor to assert such general claims for its individual benefit would clearly, and adversely, affect the bankruptcy estate.

127.    Even if those claims were personal to individual asbestos claimants, "[i]n the asbestos context,…this standard [for "related to" jurisdiction] applies whether any claims against a third party are alleged to be 'direct' or 'derivative.'"[126] "An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate."[127] A proceeding "need not necessarily be against the debtor or against the debtor's property" to confer jurisdiction.[128] Third-party litigation involving these claims could at least "conceivably" and adversely affect the Debtor's estate, so even if individual, the litigation is still "related to."[129]

128.    The Representatives argue that but for the Corporate Restructuring, there would be no Debtor, no allocation of asbestos liabilities, no indemnification obligations, no Secondment Agreement or even a need to centralize asbestos claims in one forum. Reciting the well-known legal maxim that "no action by the parties can confer subject-matter jurisdiction on a federal court," the Representatives suggest subject matter jurisdiction does not lie in this case.[130]

---

[126] *Bestwall*, 606 B.R. at 249.
[127] *Robins*, 788 F.2d at 994.
[128] *Pacor*, 743 F.2d at 994.
[129] *See, e.g.*, Bestwall, 606 B.R. at 249-51.
[130] ACC Obj., 19; *see also* FCR Obj., 21-22.

129.     Of course, parties cannot, *on their own*, *create (or waive)* subject matter jurisdiction *by consent* — a federal court either has it, or it does not.[131]  Here, however, it was the Debtor's bankruptcy filing, not the prepetition merger or agreements between DBMP and New CertainTeed that create federal jurisdiction over the Chapter 11 Case and estate property.[132]

130.     The Representatives' related arguments based upon 28 U.S.C. § 1359 also fail.  Section 1359 bars jurisdiction "of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." It generally prohibits parties from manufacturing jurisdiction to channel ordinary business litigation into the federal courts.[133]

131.     Section 1359 has been used almost exclusively to prevent gaming of federal courts' diversity jurisdiction.[134] This bankruptcy proceeding of course, is not a diversity action.

132.     In fact, Section 1359 may not even apply in bankruptcy.[135] If it does, Section 1359 would not apply here as no one has been "made or joined" as a "party" "to invoke" this Court's jurisdiction. The Debtor, as plaintiff, is a party because it filed this adversary proceeding in its bankruptcy case.  The Defendants are parties because according to the Debtor, they could potentially assert the DBMP Asbestos Claims in derogation of the estate.

133.     Similarly, jurisdiction over this adversary proceeding is not based upon an assignment to, or a joinder of, the Defendants (or even the Debtor) as parties to the action— the

---

[131] *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

[132] *See* 28 U.S.C. § 1334(b).

[133] *See* Kramer v. Caribbean Mills, Inc., 394 U.S. 823, 828-29 (1969).

[134] *See, e.g.*, *Bishop v. Hendricks*, 495 F.2d 289, 292-93 (4th Cir. 1974); *Long & Foster Real Estate, Inc. v. NRT Mid-Atl., Inc.*, 357 F. Supp. 2d 911, 921 (E.D. Va. 2005).

[135] No case has been identified from or within the Fourth Circuit that has ever applied section 1359 to bankruptcy proceedings. *See Longview Power, LLC v. First Am. Title Ins. Co. (In re Longview Power, LLC)*, 516 B.R. 282, 293 (Bankr. D. Del. 2014) (application of section 1359 to bankruptcy proceedings is not clear).

focus of section 1359. Again, "arising in" and "arising under" jurisdiction exist simply because DBMP is a Debtor in bankruptcy. At a minimum, "related to" jurisdiction exists because any DBMP Asbestos Claim that a Defendant might bring against the Protected Parties could conceivably have an effect on the Bankruptcy Estate.

134.    Finally, several Courts have found that they have subject matter jurisdiction to consider and determine the merits of a preliminary injunction against third-party claims in an asbestos bankruptcy.[136] This Court declines to deviate from this precedent.

135.    Venue is proper under 28 U.S.C. § 1409. These matters present "core proceedings," or at a minimum, "related to" proceedings under 28 U.S.C. § 157(b).

## B.    The 2019 Corporate Restructuring Was Not Preempted by Section 524(g).

136.    The undersigned agrees with Judge Beyer in *Bestwall* that a divisional merger under the Texas law is not preempted by Section 524(g).[137] The Texas statutes and Section 524(g) serve different purposes.

137.    There is a "strong presumption against inferring Congressional preemption" of state law.[138] And "[t]his presumption is strongest when Congress legislates in a field which the States have traditionally occupied"—such as the field of corporate organization relevant to the Texas provisions.[139]

138.    Here, the ACC argues only for implied preemption, which can occur either through conflict or field preemption. "Conflict preemption" occurs "when compliance with both federal and state regulations is a physical impossibility, or when state law stands as an

---

[136] *See, e.g., Bestwall*, 606 B.R. at 249; *In re Specialty Prods. Holding Corp.*, No. 10-11780, Adv. Pro. No. 10-51085, at 2 [Adv. Pro. Dkt. 72] (Bankr. D. Del. Oct. 13, 2010); *In re W.R. Grace & Co.*, 386 B.R. at 28-30; *see also In re Garlock Sealing Techs. LLC*, No. 10-31607, Adv. Pro. No. 10-03145, at 2 [Adv. Pro. Dkt. 14] (Bankr. W.D.N.C. June 21, 2010).
[137] *See Bestwall*, 606 B.R. at 251.
[138] *Integrated Sols., Inc. v. Serv. Support Specialties, Inc.,* 124 F.3d 487, 493 (3d Cir. 1997).
[139] *S. Blasting Servs., Inc. v. Wilkes Cty., N.C.,* 288 F.3d 584, 590 (4th Cir. 2002).

obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[140] There is no conflict preemption here, because, as *Bestwall* noted, the Texas divisional merger provisions and section 524(g) "concern completely different subjects and work readily in tandem."[141] There also is no conflict apparent in the "[s]tatutory text and structure" of the provisions, which are "the most reliable guideposts in th[e] [preemption] inquiry."[142]

139.    The ACC argues that the Texas divisional merger provisions, "as applied" to the 2019 Corporate Restructuring, create an obstacle to the purpose of section 524(g) because the Texas provisions (a) allow asbestos liabilities to vest in one entity created through a divisional merger, and not the other, (b) without the "procedural and due process protections" of section 524(g) of the Bankruptcy Code, and (c) without requiring the dividing company to file for bankruptcy.[143] This argument confuses both the nature and effects of the divisional merger as well as the purposes of section 524(g).

140.    The section 524(g) procedural measures upon which the ACC relies are required under that section for the discharge of claims and demands and the channeling of all current and future claims to a trust. All of the procedural and substantive protections afforded under section 524(g) remain in place.

141.    Meanwhile, the 2019 Corporate Restructuring did not finally resolve any of Old CertainTeed's asbestos liabilities; it only allocated, as between DBMP and New CertainTeed, which entity was to bear those liabilities. As we discuss below, the Divisional Merger statutes implicitly presume that the new corporation to which those liabilities are allocated

---

[140] *Id.*
[141] *Bestwall*, 606 B.R. at 251.
[142] *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 474 (4th Cir. 2014), aff'd sub nom., *Hughes v. Talen Energy Mktg., LLC,* 136 S.Ct. 1288 (2016).
[143] ACC Obj. 72-73.

will have the ability to pay those liabilities.  If not, creditors of the old entity may contest the merger, including the asset and liability allocations. They may seek to hold the other company responsible for those liabilities.[144]

142.    All of those safeguards generally available to protect creditors' rights, including fraudulent-transfer laws, remain in effect.[145] To date, New CertainTeed has not escaped, discharged, or eliminated any liability for DBMP Asbestos Claims through the divisional merger.

143.    There is also no basis to find field preemption "of asbestos-related corporate reorganizations."[146] "Field preemption" occurs when "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it."[147] Field preemption is rare and requires a showing that Congress has "regulat[ed] so pervasively that there is no room left for the states to supplement federal law," or that "there is a 'federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'"[148]

144.    Section 524(g) itself confirms the absence of field preemption because it expressly contemplates prepetition corporate restructurings without establishing any requirements for them.[149] This reflects the long-standing principle that corporate governance is traditionally left to the States: "No principle of corporation law and practice is more firmly established than a state's authority to regulate domestic corporations."[150]

---

[144] *See* Section III(C)(i) below.

[145] *Id.*

[146] ACC Obj., 75.

[147] *S. Blasting Servs.*, 288 F.3d at 590.

[148] *U.S. v. South Carolina*, 720 F.3d 518, 528-29 (4th Cir. 2013); *Accord Hillsborough Cty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985). The Court is not persuaded that *MSR Exploration, Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 913-14 (9th Cir. 1996) supports the ACC's field preemption argument. The facts of that case are distinguishable from the facts here; the Debtor is not collaterally attacking or seeking to address asbestos claims outside the chapter 11 process.

[149] *See* 11 U.S.C. § 524(g)(4)(A)(ii)(IV).

[150] *CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69, 89 (1987); see also Cort v. Ash, 422 U.S. 66, 84 (1975).

145.     Section 524(g) also is not sufficiently comprehensive to occupy the field of resolution or discharge of asbestos liabilities. Even after section 524(g) became law, the Supreme Court called on Congress to do more regarding asbestos liabilities, recognizing that Congress had not comprehensively addressed the area.[151]

### C.     The 2019 Corporate Restructuring Appears Materially Prejudicial to the Rights of Asbestos Claimants, and in Accordance with the Texas Statutory Scheme, is Subject to Legal Challenge.

146.     At the center of the disputes in this case is the propriety of what the ACC terms the "Texas Two Step," a Divisional Merger followed by a bankruptcy by the new company bearing the old company's asbestos liabilities and in which the debtor seeks Section 524(g) relief for the entire enterprise.

147.     DBMP and New CertainTeed maintain that these are practical, prudent and fair actions that enable the CertainTeed Enterprise to globally resolve its asbestos claims under Section 524(g) without subjecting the entire enterprise and its other stakeholders to the deleterious effects of chapter 11. Due to the Funding Agreement, these parties argue DBMP has the same ability to pay asbestos claims as did Old CertainTeed, and New CertainTeed is more than willing to do so. Asbestos claimants are not hurt.

148.     By contrast, the Representatives view these actions as a craven effort by Old, and now New, CertainTeed to separate asbestos claimants from the enterprise assets. The Divisional Merger allocations, they contend, have all of the attributes of a fraudulent transfer. Worse, by virtue of Section 362 and the proposed preliminary injunction, the CertainTeed entities seek not just a stay of recovery actions against the Debtor, but also as against New CertainTeed, the Other Affiliates, and the Distributors. This, the Representatives say, gives these non-debtors

---

[151] *See, e.g., Ortiz Fibreboard Corp.*, 527 U.S. 815, 821 (1999); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 598 (1997).

protections afforded a bankruptcy debtor (e.g., the automatic stay, access to Section 524(g)) but without the corresponding creditor protections imposed by the bankruptcy Code on debtors (e.g., the absolute priority rule, debtor transparency, and court supervision)).

149.    We should note here what is <u>not</u> before this Court for decision. First, there is no pending motion to dismiss the case as a "bad faith" filing. Even if there were, it would likely fail—as it did in *Bestwall*—due to the exacting *Carolin* dual requirements of "subjective bad faith" and "objective futility."[152]

150.    Although no motion to dismiss has been filed here, the Representatives seek the functional equivalent.  They openly express their desire for an end to this bankruptcy case. Thus, they argue for a denial of the Preliminary Injunction request and a grant of relief from stay to prosecute the DBMP asbestos claims in the tort system. Either would effectively end DBMP's reorganization effort.

151.    Second, and while there have been many arguments made suggesting that the Divisional Merger was a fraudulent transfer, etc., at present, there is no pending action in this case that challenges the transaction. While a few individual creditors have filed such actions in state court, DBMP, the debtor in possession (which holds the powers and duties of a bankruptcy trustee in chapter 11), has not.  Nor can it be expected to do so given its close relationship to New CertainTeed. Although the Representatives believe the merger to be a fraudulent conveyance, to date they have not sought authority to pursue such an action on behalf of the bankruptcy estate.[153] Instead, they seek dismissal of the case, but indirectly.

---

[152] In *Bestwall*, the motion to dismiss failed without regard to the Debtor's alleged 'bad faith.' With Georgia Pacific promising to fund any Section 524(g) plan, the movants could not demonstrate the "objective futility" of the chapter 11 attempt. *See In re Bestwall LLC*, 605 B.R. at 48-51 (citing *Carolin Corp.,* 886 F.2d at 700-01).

[153] *In re Commodore Int'l, Ltd.,* 262 F.3d 96, 100 (2d Cir.2001) (A creditors' committee  may acquire standing to pursue the debtor's claims if (1) the committee has the consent of the debtor in possession or trustee, and (2) the court finds that suit by the committee is (a) in the best interest of the bankruptcy estate, and (b) is necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings.); accord *Off. Comm. of Unsecured*

152.    Given this, we are not in a position today to rule on the core dispute between the parties: whether New CertainTeed should be held liable for the DBMP asbestos liabilities. Even so, this topic informs the two Motions which are before us, and some preliminary observations are in order about the Texas Divisional Merger and how it was employed by Old CertainTeed.

i.    The Texas Divisional Merger Laws

153.    For over 30 years, Texas law has permitted divisional mergers that permit an existing corporation to divide itself into two or more new entities.[154]

154.    Under the current version of the TBOC, upon a divisional merger in which the dividing entity does not survive, "all liabilities and obligations" of the dividing entity automatically "are allocated to one or more of the . . . new organizations in the manner provided by the plan of merger."[155] Except as otherwise provided, "no other . . . entity . . . created under the plan of merger is liable for the debt or other obligation."[156]

155.    Technically, the 2019 Corporate Restructuring met all applicable state-law requirements to effect a divisional merger. At the moment of the merger, Old CertainTeed was domiciled in Texas.[157] It made the necessary filings, including filing a plan of merger (specifying, among other things, an allocation of assets and liabilities) with the Secretary of State.[158]

---

*Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 566 (3d Cir. 2003) (Sections 1109(b) and 1103(c)(5) confer upon creditors' committees the right to sue derivatively.).

[154] *Compare* Tex. Bus. Corp. Act Ann. art. 5.06A(2), (3) (Vernon Supp. 1990) *with* Tex. Bus. Orgs. Code Ann. § 10.008(a)(2), (3).

[155] Tex. Bus. Orgs. Code Ann. § 10.008(a)(2), (3).

[156] *Id.* § 10.008(a)(4).

[157] There is no minimum period for which an entity must be domiciled under Texas law. *Phillips v. United Heritage Corp.*, 319 S.W.3d 156, 163 n.5 (Tex.App. 2010); *see also* Tex. Bus. Orgs. Code Ann. § 1.101.

[158] *See* Tex. Bus. Orgs. Code Ann. §§ 10.001(b), 10.002, 10.003, 10.151.

156.    Upon the divisional merger, Old CertainTeed ceased to exist.[159] Its assets and liabilities were allocated to the two newly created entities, DBMP and New CertainTeed. All of Old CertainTeed's asbestos liabilities were exclusively allocated to DBMP.

157.    But, while the TBOC permits a company to engage in a divisional merger, it does not permit that company to thereby prejudice its creditors. The TBOC explicitly states that the merger provisions do not "abridge any right or rights of any creditor under existing laws."[160]

158.    This has been the unwavering, stated policy behind the Texas divisional merger statute since it was first adopted. The original version of the statute, Texas Business Corporations Act § 5.15. provided: "Antitrust Laws; Creditors." "Nothing contained in Part 5 of this Act shall ever be construed as affecting, nullifying or repealing the Anti-trust laws or as abridging any right or rights of any creditor under existing laws."

159.    So too the legislative history: "[c]reditors' rights would not be adversely affected by the proposed amendment, and creditors would continue to have the protections provided by the Uniform Fraudulent Transfer Act and other existing statutes that protect the rights of creditors."[161]

160.    In 2006, when the Texas Business Corporations Act ("TBCA") was transformed into the TBOC, no change to this policy was made. The divisional merger statute moved from section 5 of the TBCA to section 10 of the TBOC, but only non-substantive changes were made to the creditor protection provisions.[162]

---

[159] The FCR has argued that "Old CT, the non-surviving entity under the divisional merger, 'continues in existence until the third anniversary of the effective date of [its] termination,' pursuant to section 11.356 of the TBOC." FCR's Post-Hearing Br. [Adv. Pro. Dkt. 312] at 6 . However, Section § 11.356(a) addresses the statutory dissolution and winding up of an entity and is not applicable to a divisional merger under Chapter 10 of the TBOC. *See* Tex. Bus. Orgs. Code Ann. § 11.356(a)

[160] Tex. Bus. Orgs. Code Ann. § 10.901.

[161] H. COMM. ON BUS. & COM., BILL ANALYSIS, H.B. 472, 1989 Leg., 71st Reg. Sess., at 23 (Tex. 1989).

[162] *Id.* at 1.

161.    Curtis Huff, a primary author of the Texas divisional merger statute,[163] has confirmed that the rights of creditors under federal and state fraudulent transfer laws are not abrogated or abridged by such a merger:

> "While the provisions permitting multiple surviving entities in a merger were intended to provide corporations with greater flexibility in structuring acquisition and restructuring transactions, **they were not intended to have any material effect on the existing rights of creditors** of the parties to a merger."[164]

162.    Huff further explains that "all laws protecting the rights of creditors with respect to fraudulent conveyances, preferences and insolvency will remain in force and apply."[165] "Principal among the laws available to protect creditors in mergers with multiple survivors are the Uniform Fraudulent Transfer Act (the "UFTA"), the Uniform Fraudulent Conveyance Act (the "UFCA") and the United States Bankruptcy Code of 1978, as amended (the "Bankruptcy Code")."[166]

163.    And although "a merger will not involve a 'transfer' of assets in the traditional sense," the "allocation of assets in a merger should constitute both a 'transfer' and 'conveyance' of assets under both the letter and spirit of the UFTA, the UFCA and the Bankruptcy Code."[167] "The allocation of liabilities of the parties to a merger among the surviving entities in the merger should also constitute the incurrence of obligations under the UFTA and the Bankruptcy Code by the surviving entities."[168]

---

[163] Curtis Huff was a member of the subcommittee of the Corporation Law Committee of the Business Law Section of the State Bar of Texas that drafted the amendments to the merger provisions of the TBCA
[164] *See* Curtis Huff, *The New Texas Business Corporation Act Merger Provisions*, 21 ST. MARY'S L.J. 109, 110 n.2 (1989) (emphasis added).
[165] *Id.* at 109.
[166] *Id.* at 126.
[167] *Id.* at 129.
[168] *Id.* at 129-30.

164.    In particular, the allocation of a creditor's claim to another corporation in a merger with multiple survivors will allow the creditor to challenge the merger and the transfer of assets if any of the requirements of fraudulent transfer law are met, including (1) the original corporation was insolvent and the transfer of assets to the other resulting corporation or entity was not for reasonably equivalent value or for fair consideration, (2) the transfer of assets to the resulting entity was not for reasonably equivalent value or fair consideration, and the resulting entity has an unreasonably small amount of assets in relationship to the business or transactions conducted or contemplated to be conducted by it or the resulting entity intended to incur, or believed that it would incur, debts beyond its ability to pay as they become due and absolute, or (3) the merger was effected with an actual intent to hinder, delay or defraud any creditor of the original corporation or the resulting entity.[169]

165.    Huff's analysis anticipates the current dispute and how it should be addressed: "**if in a merger with multiple survivors, the parties allocate a creditor's claim to an inadequately capitalized or insolvent corporation, that creditor will have the right to challenge the merger as a fraudulent transfer**."[170]

166.    As for a remedy, and "[a]lthough various remedies are possible where the allocation of a liability in a merger constitutes a fraudulent transfer, the most appropriate remedy in such a case would generally be to **reallocate all or a portion of the allocated liability to one or more of the surviving entities in the merger or to make some or all of the resulting entities liable for all or a portion of the liabilities** of the predecessor debtor corporation."[171]

---

[169] *Id.* at 131-32.
[170] *Id.* at 133. (emphasis added).
[171] *Id.* at 132 n.73. (emphasis added).

167.    Thus, if a corporation uses a divisional merger to dump its liabilities into a newly created "bad" company which lacks the ability to pay creditors while its "good" twin corporation walks away with the enterprise's assets, a fraudulent transfer avoidance action lies.[172]

168.    DBMP maintains that nothing like this has happened. Between the Funding Agreement and the other allocated assets, the Debtor claims to have the same funding capacity after the 2019 Corporate Restructuring as did Old CertainTeed immediately before the restructuring.

169.    Possibly, but that is not the relevant question. Under the TBOC, the proper question is—were the rights of creditors, here asbestos claimants, and future demands, materially affected by the Merger and its asset and liability allocations? The preliminary answer to that question is, yes.

170.    Before the Corporate Restructuring, Old CertainTeed's asbestos creditors had the same ability and rights to access Old CertainTeed's considerable assets as did its other unsecured (non-asbestos) creditors. As a result of the Corporate Restructuring, asbestos creditors were placed one step beyond those assets and made dependent on the DBMP's willingness to press its rights under the Funding Agreement. As discussed above, the Funding Agreement is conditional, unsecured, and can be enforced only by DBMP acting through seconded SGC employees, not by the asbestos claimants. The willingness to seek funding and New CertainTeed's willingness to pay asbestos claimants cannot simply be assumed.   Apart from the Funding Agreement, DBMP lacks the ability to pay asbestos claims.

---

[172] *See* Cliff Ernst, *Steps to Accomplish a Divisional Merger, in Divisive [Sic] Mergers: How To Divide An Entity Into Two Or More Entities Under A Merger Authorized By The Texas Business Organization Code,* 2016 Wl 10610449 (Tex. 2016) ("[O]ne could certainly imagine an egregious situation where all assets were allocated to one party to the merger and all liabilities were allocated to another party without assets and creditors might attempt to void the transaction as a fraudulent conveyance.")

171.    Perhaps DBMP and New CertainTeed mean exactly what they say. Perhaps DBMP will negotiate a plan acceptable to the asbestos claimants. Perhaps New CertainTeed will fund that plan, and all of these liabilities will be satisfied. It is too early to say.

172.    However, at the moment, it appears that the Divisive Merger had a material, negative effect on the asbestos creditors' ability to recover on their claims. Thus, an action to contest the merger and its exclusive allocation of all of Old CertainTeed's asbestos claims to DBMP, appears to be a viable cause. But with DBMP in bankruptcy the next question is, "Who has standing to assert such claims, individual asbestos claimants or a bankruptcy trustee?" To answer that question, we must consider the nature of the claims at issue, and the procedural posture of this case.

**D.      The Prosecution of DBMP Asbestos Claims is Stayed Pursuant to Sections 362(a)(1) and 362(a)(3) of the Bankruptcy Code.**

i.      <u>Section 362(a)(1)</u>

173.    By virtue of the TBOC, DBMP is liable for Old CertainTeed's asbestos liabilities, the so called DBMP Asbestos Claims.  With the bankruptcy filing, the Claimants are stayed from prosecuting DBMP Asbestos Claims <u>against the Debtor</u> pursuant to section 362(a)(1) of the Bankruptcy Code. Section 362(a)(1) of the Bankruptcy Code prohibits the "commencement or continuation . . . of a judicial . . . proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title."[173]

174.    As the Representatives point out, Section 362(a)(1) ". . . provides only for the automatic stay of judicial proceedings and enforcement of judgments 'against the debtor or the

---

[173] 11 U.S.C. § 362(a)(1).

property of the estate.'"[174] It does not typically shield non-debtor codefendants from asbestos lawsuits.[175]

175.   At the moment, however, there are no such codefendants for whom injunctive relief is sought. The claims that the asbestos claimants wish to prosecute against New CertainTeed et. al. were once claims against Old CertainTeed. Old CertainTeed is no more, and, at present, the Debtor is exclusively responsible for the DBMP Asbestos Claims.[176] Thus, pressing the DBMP Asbestos Claims against the Protected Parties in the tort system would necessarily result in the liquidation and recovery of claims against the Debtor outside of the bankruptcy case. This is barred by the automatic stay.

176.   The automatic stay imposed by section 362(a)(1) also either presently extends to or can be extended through this action to enjoin actions against the Protected Parties, who share such an identity of interests with the Debtor that the Debtor is, in effect, the real party defendant.[177]

177.   The Fourth Circuit in *Robins* described the type of situation that would cause such an identity of interests: "An illustration of such a situation would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case."[178] "To refuse application of the statutory stay in that case would defeat the very purpose and intent of the statute."[179] This logic applies equally to situations where third-party litigation raises collateral estoppel and *res judicata* issues for the debtor.[180]

---

[174] *Credit Alliance Corp. v. Williams*, 851 F.2d 119, 121 (4th Cir. 1988).
[175] *Williford v. Armstrong World Industries, Inc.*, 715 F.2d 124 (4th Cir. 1983).
[176] Tex. Bus. Orgs. Code Ann. 10.008(a)(4).
[177] *See Robins*, 788 F.2d at 999.
[178] *Id.*
[179] *Id.*
[180] *See id.*

178.     Both situations described by the *Robins* court are present here. Litigating

the DBMP Asbestos Claims against the Protected Parties would effectively liquidate claims

against the Debtor. And it could potentially trigger indemnification rights.[181] There is an even an

outside risk that such litigation could bind the Debtor through *res judicata* and collateral estoppel,

or by creating an evidentiary record that prejudices the Debtor.[182] The Debtor thus is the real party

defendant in any suit seeking to liquidate and recover on account of a DBMP Asbestos Claim,

even if directed at a Protected Party, and section 362(a)(1) applies to stay such actions.

ii.      Section 362(a)(3)

179.     Additionally, any such effort to pursue New CertainTeed and the Other

Affiliates would necessarily involve third parties asserting claims which are now held by the

DBMP bankruptcy estate. As the preceding analysis of the Texas Merger statutes reflects, to hold

New CertainTeed and the Other Affiliates liable for debts allocated under the merger to DBMP,

asbestos claimants will be required to assert (as some already have) claims for fraudulent transfer,

successor liability, and/or alter ego arising from the Divisional Merger.

180.     The law in the Fourth Circuit is that certain theories of recovery through

which claimants seek to liquidate the debtor's liability on a claim against a non-debtor are

property of the debtor's estate. These include alter ego and successor liability theories of

recovery.[183]

---

[181] We need not decide today whether the indemnification provisions of the Support Agreement would give rise to absolute indemnification rights in this case. As noted, this was not an arm's length agreement, and it was made in contemplation of a bankruptcy filing by one of Old CertainTeed's successor entities. Under similar circumstances, at least one Court has brushed aside such an agreement. *Schmoll v. ACandS, Inc.,* 703 F. Supp. 868, 869 (D. Or. 1988), aff'd, 977 F.2d 499 (9th Cir. 1992). It is sufficient for now to say that if enforceable, under the authorities cited by DBMP, the Support Agreement would give rise to indemnification claims against the DBMP estate.
[182] Admittedly, this is a lesser concern as historically, DBMP has not experienced such legal handicaps.
[183] *See, e.g., Steyr-Daimler-Puch of Am. Corp. v. Pappas,* 852 F.2d 132, 136 (4th Cir. 1988); *In re Anderson & Strudwick, Inc.,* No. 14-32679, Adv. Pro. 14-03175, 2015 WL 1651146, at 5 (Bankr. E.D. Va. Apr. 8, 2015); *Mitchell v. Greenberg (In re Creative Entm't, Inc.),* Adv. Pro. No. 00-3114, 2003 Bankr. LEXIS 2468, 28-29 (Bankr. W.D.N.C. May 28, 2003). *Acme Boot Co. v. Tony Lama Interstate Retails Stores, Inc.,* 1991 WL 39457, 929 F.2d 691 (4th

181.    One can split hairs as to whether fraudulent transfer claims are property of the estate or whether they simply permit avoidance of certain transfers with the estate standing in the shoes of creditors.[184] For present purposes, the net result is the same. With DBMP in bankruptcy, under the Fourth Circuit's "first crack" rule, it is the bankruptcy trustee, not individual asbestos claimants, that has standing to assert fraudulent conveyance claims and claims that share the same underlying focus as fraudulent conveyance claims.[185] "Reserving the [fraudulent conveyance] action for the [Debtor] maintains the integrity of the bankruptcy proceedings and ensures that individual creditors cannot hijack the bankruptcy process."[186]

182.    Or as our U.S. District Court has put it: "In the Fourth Circuit the rule is settled that [section] 362(a)(3) [of the Bankruptcy Code] stays automatically—without a restraining order—a creditor's claim against a third-party that the debtor can assert for the benefit of the estate."[187]

183.    Thus, the claims which the Representatives propose to return to the tort system to be asserted by individual asbestos claimants for their individual benefits are (1) claims against DBMP by virtue of the TBOC, and (2) remedy claims which seek to make New CertainTeed and the Other Affiliates liable for those same asbestos liability claims under theories of fraudulent conveyance, alter ego, etc. The former are claims against the debtor whose liquidation is stayed by Section 362(a)(1). The later remedial claims are either bankruptcy estate

---

Cir. 1991), cited by the ACC, is distinguishable, in part because it addresses a successor claim applicable only to a single creditor, rather than a claim generally available to the debtor's other creditors.

[184] Contrast *In re Midstate Mills, Inc.*, No. 13-50033, 2015 WL 5475295, at *7 (Bankr. W.D.N.C. Sept. 15, 2015) with *In re Fabian*, 458 B.R. 235, 258 (Bankr. D. Md. 2011).

[185] *See* 11 U.S.C. § 544(b); 11 U.S.C. § 548; *Nat'l Am. Ins. Co. v. Ruppert Landscaping Co., Inc.*, 187 F.3d 439, 441 (4th Cir. 1999).

[186] *Ruppert*, 187 F.3d at 442.

[187] *In re Litchfield Co. of S.C. Ltd. P'Ship*, 135 B.R. 797, 803 n.4 (W.D.N.C. 1992).

property under Section 541 and/or avoidance claims. Both are subject to the automatic stay under Section 362(a)(3).

### E.    The ACC's Motion for Relief from Stay

184.    Anticipating this might be the case, the ACC has moved for relief from stay to permit the asbestos claimants to individually liquidate their tort claims against DBMP and New CertainTeed in the tort system.

185.    The Representatives argue that under the unusual circumstances presented in this case, it would be appropriate to send all 60,000+ asbestos claims back to the tort system, even as the bankruptcy case proceeds. This, they say, is justified by the gross inequities of the Corporate Restructuring and the Debtor's lack of good faith in pursuing this bankruptcy case.[188] They argue that the Corporate Restructuring has structurally subordinated asbestos creditors even as the non-asbestos creditors of Old CertainTeed are being paid in the ordinary course of business.

186.    The Representatives believe this inequity would be compounded by preliminarily enjoining actions against the Protected Parties.  The Representatives further suggest that, by stranding the asbestos claimants in bankruptcy, the Debtor is seeking a "bankruptcy discount" of its tort-system liability in this Chapter 11 Case. With the asbestos liabilities "ring-fenced" within the Debtor, New CertainTeed is free to upstream its net income to parent companies. Thus, the Debtor is incentivized to prolong this reorganization case until the asbestos claimants knuckle under and accept a Plan that pays them less than that to which they are entitled.

---

[188] ACC Opposition [Adv. Pro. Dkt. 216 at p. 29-30, 63-67].

187.    The ACC's Stay Motion is also premised on the idea that no harm will come to the Debtor by allowing all of its creditors relief from stay to pursue their claims in other courts. This most unusual suggestion is based upon the ACC's reading of the Funding Agreement.[189]

188.    The ACC posits the following: New CertainTeed has agreed to fund the Debtor to both litigate and pay the asbestos claims. That funding is unlimited, covers both defense and indemnity payments, and has no deductibles or exclusions.  New CertainTeed and Saint-Gobain (the ultimate Parent of both companies) have adequate means to provide the funding agreed to in the Funding Agreement. Given this, the ACC concludes that the Debtor has the wherewithal to litigate and satisfy any asbestos liabilities as they become due. There is no need for a bankruptcy stay.

189.    The ACC analogizes its stay relief request to the circumstance where a debtor possesses unlimited insurance coverage. In such cases, bankruptcy courts routinely grant relief from stay to creditors to seek recovery against the insurance in state court.  In particular, the ACC refers to this Court's recent decision in *Kaiser*[190] where such relief was granted.

i.    <u>The ACC's Requested Relief Is Not Possible Because the Funding Agreement Would Not Provide Funding to Pay Asbestos Claims Outside of a Plan.</u>

190.    However, the relief sought by the ACC—notably the payment of all prepetition asbestos claims outside of a confirmed plan of reorganization but while this Chapter 11 Case is pending—is neither proper, nor possible under the terms of the present Funding Agreement.

191.    The Representatives misread the Funding Agreement. Assuming for the

---

[189] This in contrast to the Representatives responses to the Preliminary Injunction request where they argue that because the Funding Agreement is conditional and must be enforced by the Debtor as against New CertainTeed, it is unlikely to provide full payment to asbestos claimants.
[190] No. 3:16-bk-31602 (Bankr. W.D.N.C. Aug. 9, 2018), ECF No. 1108

moment that the Funding Agreement is a legally enforceable contract, it is limited by its terms. Under North Carolina law, "'[w]hen the language of a contract is clear and unambiguous, effect must be given to its terms, and the court, under the guise of construction, cannot reject what the parties inserted or insert what the parties elected to omit.'"[191]

192.    The language of the Funding Agreement is clear and unambiguous. The Debtor may use any funding provided by New CT only for a "Permitted Funding Use." New CertainTeed is obligated to provide funding only for "Permitted Funding Uses."[192] Payment of asbestos-related judgments and settlements is a Permitted Funding Use only when no chapter 11 case is pending.[193]

193.    The ACC misreads sub-clause (d) of the definition of "Permitted Funding Use," which affords the Debtor the right to request funding of its bank account to maintain a reserve of up to $5 million (the "Reserve Fund").[194]

194.    The Reserve Fund provision does not allow the Debtor to require New CertainTeed to fund the Debtor's bank account in perpetuity no matter how the Debtor uses those funds.[195] Such a reading of the Reserve Fund clause would render meaningless all the Funding Agreement's other terms defining Permitted Funding Uses and limiting DBMP's payments, and New CertainTeed's obligations, to Permitted Funding Uses (*i.e.*, by providing an evergreen fund for uses not otherwise permitted). It is well established that a court should construe contract terms, where possible, to give rational meaning to all provisions in the contract.[196]

---

[191] *Onewest Bank FSB v. Peoples Bank (In re Finding)*, Nos. 10-40125, 10-4033, 2012 WL 5993700, *4 (Bankr.W.D.N.C. Nov. 30, 2012) (quoting *Taylor v. Gibbs*, 268 N.C. 363, 365, 150 S.E.2d 506, 507 (1966)).
[192] Pl.'s Ex. 13, Funding Agreement §§ 5, 2(a).
[193] *Id.* § 1.
[194] *See* Pl.'s Ex. 13, Funding Agreement § 1.
[195] *Id.* §§ 5, 2(a).
[196] *Int'l Eng'g & Trading Corp. v. Ingersoll-Rand Co.*, Civil No. 3:12CV294-DSC, 2012 WL 5354998, *5 (W.D.N.C. Oct. 30, 2012).

195.    Specific language in a contract controls over general language.[197] Here, sub-clause (c) of the definition of "Permitted Funding Use" specifically addresses what asbestos-related liabilities are covered by the Funding Agreement during each period of time, and hence controls over the general provision in sub-clause (d).

196.    Nor does the testimony of Starczewski support the ACC's reading of the Funding Agreement as the ACC suggests.[198] When asked how the Funding Agreement might operate in connection with a hypothetical lift-stay scenario, Starczewski testified that he would need to "refer back to the funding agreement" and only after so qualifying his answer, offered a "belief" about how it might work.[199] He then expressly clarified that the "best source for understanding the terms and obligations" of the various restructuring agreements, of course, were the agreements themselves to which he "deferred" on the question of "interpretation."[200]

197.    Regardless, the Funding Agreement is unambiguous and not subject to interpretation through parole evidence.[201]

198.    Finally, the use of the Reserve Funds to pay asbestos-related judgments or settlements during the bankruptcy case would violate the covenant against unpermitted uses of funds in Section 5 of the Funding Agreement.[202]

199.    The ACC purports to limit the relief it seeks by requiring claimants to "agree in writing that any settlement or judgment in respect of his or her asbestos personal injury claim may not be enforced against the assets of the Debtor, other than those available through the Funding Agreement."[203] This "waiver" by claimants, however, is ineffective to protect the Debtor

---

[197] *See, e.g., In re Roberson*, Case No. 18-05432-5-JNC, 2020 WL 6265062, *5 (Bankr. E.D.N.C. Oct. 23, 2020).
[198] *See* Stay Mot. ¶ 33.
[199] Starczewski Dep. 194:24-25, Dec. 15, 2020.
[200] *Id.* at 240:6-241:14.
[201] *See Lynn,* 689 S.E.2d at 206; *Cordaro v. Singleton,* 229 S.E.2d 707, 709 (N.C. Ct. App. 1976).
[202] Pl.'s Ex. 13, Funding Agreement § 5.
[203] Stay Mot. at 25 (Conclusion).

or its estate or assist the claimants in receiving payments.

200.     First, as concluded above, no funding through the Funding Agreement would be available to pay any settlements or judgments while the Chapter 11 Case remains pending; funding is only available for a confirmed section 524(g) plan of reorganization. Nor do the claimants have the right under the Funding Agreement's terms to pursue funding from New CertainTeed directly.[204]

201.     Second, with respect to the funding of a trust established under a plan of reorganization, the Funding Agreement expressly requires that the Debtor's assets be used first.[205] The Funding Agreement is only a backstop available to the extent the Debtor's other assets are insufficient to fund such a trust.[206]

202.      Third, in order to recover, the individual asbestos claimants would necessarily have to usurp the estate's ability to assert claims against New CertainTeed or interfere with the funding that might be obtained therefrom in a negotiated Section 524(g) Plan and Trust.

ii.     There Is No Cause to Lift the Automatic Stay.

203.     The automatic stay—"one of the fundamental debtor protections provided by the bankruptcy laws"—can be lifted for cause.[207] "Cause" is a flexible concept requiring courts to conduct a case-by-case balancing test.[208]

204.     The Fourth Circuit has focused on three, non-exhaustive factors in conducting this balancing analysis:

> (1) whether the issues in the pending litigation involve only state law, so that the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater

---

[204] Pl.'s Ex. 13, Funding Agreement § 15.
[205] *Id.* § 1.
[206] *Id.*
[207] *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986); 11 U.S.C. § 362(d)(1).
[208] *See In re Beach First Nat'l Bancshares, Inc.*, 451 B.R. 406, 410 (Bankr. D.S.C. 2011).

interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court.[209]

205.    In applying the factors, the Court must balance any prejudice to the debtor's estate against the hardship that would result if stay relief is denied.[210]

206.    Applying those factors and striking that balance, we conclude the Stay Motion should be denied because: (a) prejudice to the estate would result if the stay is lifted and this prejudice significantly outweighs any hardship to the Debtor's asbestos claimants; (b) allowing the tort system to be re-flooded with asbestos cases at the same time the Chapter 11 Case remains pending would not serve judicial economy; and (c) and the fact that asbestos claims arise under state law does not support a modification of the stay because it necessarily involves individual creditors liquidating their claims against the Debtor outside of the bankruptcy proceeding, asserting estate causes of action for their individual benefit, and thwarting any attempt to globally and permanently resolve asbestos claims in a single forum.

    iii.    <u>The Debtor and its Estate will Suffer Substantial Prejudice if the Court Grants the Stay Motion, and Any Harm to Asbestos Claimants Would be Limited.</u>

207.    The Debtor and the Estate will suffer substantial prejudice if the Court grants the Stay Motion. A fundamental tenet of the automatic stay is to enable the bankruptcy court "to avoid interference with the orderly liquidation or rehabilitation of the debtor."[211] The relief sought in the Stay Motion is antithetical to that fundamental tenet.

208.    Granting the Stay Motion would deplete estate resources and irreparably

---

[209] *In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992).
[210] *See id.*
[211] *Matter of Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992).

harm the prospects for reorganization. Permitting all asbestos claimants to recommence tort litigation against the Debtor would preclude the stated purpose of this Chapter 11 Case—to obtain a permanent, global, and fair resolution of all current and future asbestos claims against it.

209.    If the Stay Motion were granted, asbestos claims would not be resolved globally in a single forum; they would be litigated piecemeal in hundreds of state and federal courts across the country. The ability to treat equitably and consistently all similarly situated claimants through a section 524(g) consensual plan of reorganization would be foreclosed; and the Debtor's ability to achieve any type of a successful reorganization would be substantially impaired, if not eliminated.

210.    The Funding Agreement would not likely eliminate the burdens and costs such litigation would impose upon the Debtor. Although the Debtor could seek funding for litigation "costs" as an expense of administration under the Funding Agreement, the terms of that agreement stipulate[212] that DBMP would have to use any cash distributions from its subsidiary Millwork & Panel first.[213] And, because of the pendency of the Chapter 11 Case, the Funding Agreement could only be used to pay asbestos-related liabilities in connection with the funding of a section 524(g) trust.[214]

211.    The Stay Motion seeks to have all asbestos claims liquidated in the tort system and for claimants to seek payment of those claims as they are liquidated. Under these circumstances, if the Court were to grant the Stay Motion, it would amount to an effective dismissal of the Chapter 11 Case without satisfying the Fourth Circuit's stringent *Carolin* dismissal standard, or even such a motion being filed.[215]

---

[212] Here we again temporarily assume the Funding Agreement to be enforceable by its terms.
[213] Pl.'s Ex. 13, Funding Agreement § 1.
[214] *Id.*
[215] *See In re Bestwall LLC*, 605 B.R. at 48-51 (citing *Carolin Corp.,* 886 F.2d at 700-01).

212.    The cases on which the ACC relies are inapposite.[216] In each, the availability of insurance permitted the court to lift the stay without harming the debtor or its estate. Here, the Debtor has no insurance coverage for asbestos-related claims.[217]

213.    The Funding Agreement is not insurance. The Debtor neither paid nor pays premiums with respect to the Funding Agreement, and there is no element of risk distribution, a key feature of insurance contracts.[218] Instead, according to its terms, the Funding Agreement is a funding backstop by New CertainTeed. Here, lifting the stay would cause irreparable harm to the Debtor by consuming the estate assets and undermining the Debtor's prospects of reorganizing.

214.    Although the ACC suggests otherwise, this Court's ruling in *In re Kaiser Gypsum Co.* does not support lifting the stay here.[219]

215.    First, unlike the debtors in *Kaiser Gypsum*, DBMP has no insurance coverage available to satisfy asbestos-related claims. As this Court noted in *Kaiser Gypsum*, "the thing that differentiates [*Kaiser Gypsum*] from [a more typical asbestos bankruptcy case] is [the debtors] have unlimited insurance[,] and that being the case, it changes all of the dynamics in the case and the parties' motivations."[220] As set forth above, the Funding Agreement is not insurance and cannot be used like the insurance in *Kaiser Gypsum*.

216.    Second, the debtors in *Kaiser Gypsum* supported the requested

---

[216] *In re Budd Co., Inc.*, Case No. 14 B 11873, 2016 WL 556287, at *2 (Bankr. N.D. Ill. Feb. 10, 2016); *In re Coronet Foods, Inc.,* No: 5:04-3822, 2005 WL 1552633, at *1 (Bankr. N.D. W. Va. June 3, 2005); *In re Fernstrom Storage & Van Co.,* 100 B.R. 1017, 1024 (Bankr. N.D. Ill. 1989); *Santa Fe Minerals, Inc. v. BEPCO, L.P. (In re 15375 Mem'l Corp.)*, 382 B.R. 652 (Bankr. D. Del. 2008), rev'd on other grounds *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605, 690 (3d Cir. 2009); *see also Admiral Ins. Co. v. Grace Indus., Inc. (In re Grace Indus., Inc.),* 341 B.R. 399, 405 (Bankr. E.D.N.Y. 2006).

[217] Starczewski Decl. ¶ 10.

[218] Courts have noted that the distribution of risk among a larger group of people is a "primary characteristic" of insurance. *La. Safety Ass'n of Timbermen-Self Insurers Fund v. La. Ins. Guar. Ass'n,* 17 So.3d 350, 358 n.7 (La. 2009); *Myers v. State Bd. of Equalization,* 192 Cal. Rptr. 3d 864 (Cal. Ct. App. 2015), rev. denied, (Dec. 9, 2015).

[219] Case No. 16-31602 (JCW) (Bankr. W.D.N.C.) [Dkt. 1108],

[220] *Kaiser Gypsum*, Hr'g Tr., 29:5-8, Aug. 13, 2020 [Dkt. 2439].

modification of the stay because it was consistent with a global agreement to resolve their

bankruptcy cases.[221] Requests to lift the stay to which the debtor stipulates, consents, or does not

object are routinely granted.[222]   But here, the Debtor has objected to the Stay Motion, and the

proposed relief would interfere with the Debtor's reorganization efforts.

217.    Third, in *Kaiser Gypsum* the stay was lifted only <u>after</u> the debtors had

reached an agreement to permanently resolve their liability for asbestos personal injury claims

pursuant to a plan of reorganization term sheet.[223] Thus, the agreed lifting of the stay in *Kaiser*

*Gypsum* was part of, and not detrimental to, a global, consensual resolution of the debtors' asbestos

liability.  In contrast, here, there currently is no agreement to resolve the Debtor's asbestos liability.

The Debtor is entitled to an opportunity to pursue a consensual resolution of its asbestos liability,

and lifting the stay would undermine, if not eliminate, the Debtor's ability to achieve such a

resolution.

218.    Finally, the stay relief in *Kaiser Gypsum* was conditioned to ensure that

the debtors would not suffer any prejudice. As above, no similar conditions are possible here.

219.    The record in this case demonstrates that any harm to asbestos claimants

caused by the continuation of the automatic stay is outweighed by the hardship to the Debtor and its

estate that would occur if the stay were lifted.

220.    The ACC asserts that the passage of time occasioned by the automatic

stay causes harm to asbestos claimants. Mesothelioma is fatal. To the extent there are any asbestos

claimants who contracted the disease due to exposure to products for which DBMP (or the

---

[221] Motion of the Debtors, the Official Committee of Asbestos Personal Injury Claimants, and the Future Claims
Representative to Lift the Stay Pursuant to 11 U.S.C. § 362 as to Certain Asbestos Personal Injury Claims, Kaiser
Gypsum [Dkt. 881] at 1.
[222] *See, e.g., In re Legacy at Jordan Lake, LLC*, 2011 WL 6008388 (Bankr. E.D.N.C. 2011).
[223] *See* Notice of Filing of Plan Term Sheet, Kaiser Gypsum [Dkt. 854].

Protected Parties) may be liable, as time passes and the stay remains in effect, those victims remain

uncompensated, and they die. Thus, they suffer harm.

221.    Despite those incontrovertible facts, the Debtor denies any such harm

will occur here as a result of this bankruptcy. DBMP notes that plaintiffs in asbestos-related tort

suits typically name multiple defendants. Denial of the Stay Motion will not prevent a claimant

from pursuing other defendants in the tort system or seeking payment from their asbestos trusts.

Historically, Old CertainTeed paid less than 4% of the total recoveries received by the typical

asbestos claimants whose claims they resolved.[224] As the asbestos claimants are currently able to

seek recovery for the largest part of their injuries, DBMP concludes that they are not harmed by

the stay.

222.    Both sides are partially correct, but neither is completely so.  Obviously,

even if a claimant can seek recovery of 96% of his damages from other tortfeasors, if he is stayed

from seeking the 4% which the debtor owes him, he is still harmed—it is simply to a lesser degree

than if he were completely stayed from seeking recovery.

223.    But what is the harm visited on these claimants? Here, the

Representatives seem to assume that DBMB's share of these liabilities will never be paid.  That

appears unlikely. Hopefully, these claims will receive payment under a consensual Section 524(g).

Otherwise, the case will be dismissed, and the claims will be returned to the tort system. The

perceived "harm" occasioned by the stay is delay in receiving payment.

224.    Within reason, delay in payment due to bankruptcy is not a reason to

grant relief from stay.[225] In theory, the bankruptcy stay causes payment delay to every unsecured

creditor in every bankruptcy case. After all, it takes time to achieve confirmed plans, to liquidate

---

[224] Bates Decl. ¶ 5; Bates Report ¶ 17.
[225] *See, e.g.*, *In re Madison Hotel Assocs.*, 18 B.R. 218, 219 (Bankr. W.D. Wis. 1982).

bankruptcy estates, to object to claims, and to make case distributions. While courts seek to minimize the time consumed by these case events, there is no avoiding such "harm," if there is to be a bankruptcy case, at all.  If delay alone were enough to provide "cause," the stay would be terminated in every case.[226]

225.    But as Judge Beyer noted in *Bestwall, "*prejudice" by delay is not confined to bankruptcy. Litigation, particularly mass tort asbestos litigation, generally requires extensive discovery, involves numerous parties, and presents complicated questions of causation.[227] Such litigation often goes on for years, if not decades. In fact, as of the Petition Date, nearly half of DBMP's pending asbestos-related claims on active dockets had been filed more than 10 years ago.[228]

226.    By contrast, a section 524(g) trust established by an asbestos debtor in chapter 11 in cooperation with the Representatives, and with each fiduciary acting in good faith and with an earnest desire to achieve a full and fair resolution of asbestos claims, could well provide all asbestos claimants—including future claimants who have yet to initiate litigation—a more efficient means to resolve their claims.[229]

227.    And even if such a trust is not forthcoming, the automatic stay will not permanently deprive asbestos claimants of their opportunity to pursue their claims. Section 362 temporarily stays pursuit while the parties attempt to reach a consensus on a section 524(g) plan.[230] If a consensus on a Section 524(g) plan is not reached in due time, the Representatives may seek dismissal or conversion for "cause" under Section 1112.

---

[226] *See In re Lewis*, 339 B.R. 814, 817 (Bankr. S.D. Ga. 2006).
[227] *Bestwall,* 606 B.R. at 257.
[228] Starczewski Decl. ¶ 44
[229] *Bestwall*, 606 B.R. at 257; Bates Decl. ¶¶ 21, 26.
[230] *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 234 (3d Cir. 2004) (as amended Feb. 23, 2005).

228.     In the meantime, and if they deem it provident, the Representatives may seek authority to pursue the causes of action challenging the merger and allocations on behalf of the Estate, meaning all asbestos claimants.[231] For if the current proceedings have proven anything, it is this: to the extent that such claims lie, the Debtor is in no position to file or prosecute them against New CertainTeed and the Other Affiliates.[232]

229.     The ACC also argues that a continuation of the stay could, in certain jurisdictions, result in a loss of damages for pain and suffering for claimants who die while the stay is in force.[233] The Committee offered no evidence on this issue at hearing.[234]

230.     However, such concerns can be, and in other cases have been, addressed through preservation of these damages in section 524(g) trusts' trust distribution ("TDPs").[235] Further, and seeking to blunt this argument, the Debtor has offered the Damages Agreement described above, which similarly preserves the right to pain and suffering recoveries even in the absence of TDPs.

---

[231] *Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 566 (3d Cir. 2003); We express no opinion whether such an action would be successful. Nor do we opine whether such an action would benefit the reorganization effort. In *Garlock*, such a proceeding was filed, and thereafter, the parties reached accord on a Section 524(g) plan and trust. However, if DBMP and New CertainTeed mean what they say—that they desire, and New CertainTeed is willing to fund, a full and fair resolution of these asbestos liabilities—it may not be necessary or productive to bring such a lawsuit.

[232] The Debtor posits that it was unharmed as a result of the Corporate Restructuring. It maintains that no aspect of the Corporate Restructuring is subject to challenge or avoidance.

[233] Stay Mot. ¶ 41.

[234] *Id.* (The ACC acknowledged that this issue only arises in "some" jurisdictions). In fact, the survival statutes in only a few jurisdictions "do not allow any recovery for the decedent's pain and suffering prior to death." 25 Am. Jur. Proof of Facts 3d 251, § 6 (citing only the Arizona and California statutes as examples and explaining that "under most wrongful death or survival acts, the victim's estate may recover for the decedent's conscious pain and suffering sustained between injury and death.").

[235] *See, e.g., In re Kaiser Gypsum Co., Inc*., Case No. 16-31602 (JCW) (Bankr. W.D.N.C. Sept. 24, 2020) [Dkt. 2481], Kaiser Gypsum Asbestos Personal Injury Trust Dist. Procedures § 7.3; *In re Specialty Prods. Holding Corp.,* Case No. 10-11780 (JKF) (Bankr. D. Del. Oct. 23, 2014) [Dkt. 5117–-3], Form of Specialty Products Holding Corp. Asbestos Trust Dist. Procedures § 7.6, available at https://www.cpf- inc.com/assets/1/6/BondexTDP.pdf (same).

iv.   Judicial Economy Would Not Be Served by Returning Thousands of
      Asbestos Cases to the Tort System.

231.   Lifting the stay would mean dumping more than 60,000 asbestos cases

back into the tort system.  It would result in piecemeal litigation of asbestos cases in multiple

state and federal courts across the country even as the Debtor is attempting to resolve those same

claims in this Court. This would undermine, if not eliminate, the Debtor's reorganization efforts

and defeat its effort to employ section 524(g) to treat its asbestos liabilities. As the Court in

*Bestwall* recognized: "Section 524(g) allows a debtor to address in one forum all potential

asbestos claims against it, both current and future, as well as current and potential future claims

against third parties alleged to be liable on account of asbestos claims against the debtor."[236] A

case dump of this magnitude would not promote judicial economy. It would be the furthest thing

from judicial economy.

v.   The Fact That Asbestos Claims Arise Under State Law Does Not Support
     Lifting the Stay.

232.   The asbestos claims against the Debtor arise under state law. However,

this fact alone does not support liquidating those claims in the state and federal courts across the

nation. Almost all claims against a bankruptcy debtor arise under state law. Nevertheless, they are

typically liquidated treated and treated   in the bankruptcy courts.[237]

233.   Section 524(g) of the Bankruptcy Code provides a debtor with a unique

mechanism to resolve its asbestos liabilities in a single forum through a consensual plan of

reorganization process.[238] Indeed, Congress enacted section 524(g) to address precisely the type

of state law-based asbestos claims faced by the Debtor. To lift the stay as to all asbestos personal

---

[236] *Bestwall*, 606 B.R. at 249.
[237] Asbestos tort claims, of course, cannot be determined in bankruptcy court. This is the function of the Section 524(g) asbestos trust.
[238] *See Bestwall*, 606 B.R at 249.

injury claims as requested would contravene the clear purpose of section 524(g) of the Bankruptcy Code.

vi.    There Has Been No Stay Waiver and Lifting the Stay Would Not
Promote Equal Treatment of the Debtor's Creditors.

234.    The ACC argues that as the Debtor's prepetition restructuring isolated Old CertainTeed's asbestos creditors in this Debtor, whereas other creditors are being paid by New CertainTeed unabated, the Corporate Restructuring effected "a structural waiver of the stay for certain creditors" that "undermines the creditor-protective purposes of the automatic stay itself."[239]

235.    DBMP counters that the 2019 Corporate Restructuring did not result in any inequality among the Debtor's creditors, all of which are subject to the automatic stay. It accuses the ACC of improperly focusing on the creditors of non-debtor New CertainTeed who are not subject to an automatic stay.

236.    DBMP further argues that the 2019 Corporate Restructuring and the transactions where were made thereunder are effective and legally enforceable. Thus, there is no risk of unequal treatment of asbestos claimants (as opposed to the other creditors of Old CertainTeed) if the stay is maintained. Rather, unequal treatment would result if the stay were to be lifted and these asbestos claims were liquidated in other courts.

237.    Here again, we partially agree with each side but with neither, in full.  The Divisional Merger and the liability allocations are facially valid under Texas law, and presently, at least, the asbestos claims of Old CertainTeed are exclusively the debts of New CertainTeed.[240]

---

[239] Stay Mot. ¶ 60.
[240] Tex. Bus. Orgs. Code Ann. § 10.008(a)(4).

238.    However, as explained, the Divisional Merger and its allocations are potentially subject to challenge as fraudulent transfers, and under alter ego, successor liability and potentially other creditor remedy legal doctrines. It is too early to draw any conclusions that these liabilities are or are not debts for which New CertainTeed and the Other Affiliates will be held accountable.

239.    As noted, Old CertainTeed apparently believed, as DBMP and New CertainTeed now believe, the Corporate Restructuring and this follow up bankruptcy case to be an appropriate way for a corporate conglomerate to use Section 524(g) to treat asbestos liabilities without subjecting the entire enterprise to the uncertainties of bankruptcy. And the two surviving companies DBMP and New CertainTeed have declared their earnest intention to fairly compensate victims under a Section 524(g) plan. Perhaps, they will.

240.    However, from the perspective of asbestos claimants, these prepetition transactions "bear all of the hallmarks" of an intentional fraudulent transfer of gigantic proportions.[241] Given the prepetition machinations which created DBMP and New CertainTeed, with one obtaining most of the enterprise value and the other all of the asbestos liabilities, the Representatives' question the Debtor's good intentions.

241.    From the Representatives' perspective, these transactions were designed to insure that the only way asbestos claims would be paid, is if the claimants vote for a Debtor-created plan[242] that limits recoveries to an amount which New CertainTeed find acceptable and which affords the Protected Parties Section 524(g) injunctive relief to which they are not entitled.

---

[241] ACC Opposition [Adv. Pro. Dkt. 216 at p. 30].

[242] Again, since the Funding Agreement purports to be nontransferable, arguably it would not be available to support any Creditor plan. Thus, only a Debtor's plan which confers Section 524(g) relief to New CertainTeed and the Affiliates would provide the ability to "fully" compensate asbestos claims.

Otherwise, the asbestos claimants will remain marooned on 'Bankruptcy Island,' even as the CertainTeed Enterprise sails on.

242.   Given that an action to challenge the Divisional Merger has yet to be filed in this case, it remains to be seen whether New CertainTeed and the Other Affiliates are themselves liable for Old CertainTeed's asbestos claims.

243.   Reflecting how far out of the norm this case lies, in response to these actions, the Representatives want to give creditors relief from stay to bring or continue tens of thousands of individual actions against DBMP and the Protected Parties in state court.  Such an en masse grant of relief from stay to all creditors to liquidate their claims against a Debtor[243] in the various state courts is, in our experience, unprecedented. So too, the proposal to allow claimants to pursue for their individual benefit, generalized injury claims which are either estate property or "first crack" avoidance claims. Either would destroy any chance of a bankruptcy resolution of these asbestos claims and future demands.

244.   The Representatives' goal is to force an outright dismissal of this bankruptcy case. This Court appreciates why these parties feel aggrieved, but we are not in a position to grant a lift stay motion that effectuates their dismissal hopes.

245.   Again, there is no pending motion to dismiss this case as a "bad faith" filing. Such an effort was made in the *Bestwall* case and it failed, due to the demanding *Carolin* standard.[244] The Representatives have not renewed their attempt in this case.[245]

---

[243] As DBMP argues, these are not insured claims, so the ACC's suggestion that this is a similar circumstance to the pending Kaiser Gypsum Plan is misplaced. *See* Section III(E).

[244] *Carolin Corp.,* 886 F.2d at 700-01.

[245] No doubt, the fact that the effort failed in *Bestwall* is the reason that no such motion was filed in this case. *Bestwall, DBMP* and *Aldrich* feature the same general cast of professionals representing, with only one notable exception, the same constituencies. As such, rulings in one of these asbestos cases lead to the parties adjusting tactics in the other cases with regard to similar disputes.

246.   And while there is reason for the asbestos claimants and their fiduciaries to question the good faith and enforceability, of the Corporate Restructuring and the merger allocations, the way to challenge those actions is not through piecemeal individual claimant actions in the tort system. It is through plan negotiation and/or an adversary proceeding filed in this case for the benefit of all asbestos claimants.

247.   And here, even if the automatic stay were lifted to permit the asbestos claimants to individually litigate claims against the Debtor, consistent with the above conclusions above, they would be unlikely to collect any judgment or settlement except under a plan of reorganization in this bankruptcy case.

248.   The automatic stay protects the Debtor and its estate. It avoids a race to the courthouse and enables a Debtor to seek a global resolution of the asbestos claims under a plan of reorganization. It remains to be seen whether the actions of Old CertainTeed, New CertainTeed and the Debtor were undertaken in good faith or, apart from DBMP who among them should be answerable to asbestos claimants. That will be sorted out in this bankruptcy case. However, it is most abundantly clear that granting relief from stay as proposed would create bedlam, produce inconsistent results for creditors, and effectively end the bankruptcy case. The Stay Motion must be denied.

## F.   The Preliminary Injunction Request

249.   Having determined (1) that the Asbestos Claims which the Defendants seek to assert against New CertainTeed and the Protected Parties are in the first instance claims against the Debtor, (2) the legal mechanisms to challenge the Corporate Restructuring so as to make New CertainTeed and the Other Affiliates liable for the asbestos claims are either estate property and/or claims for which the Estate is given the "first crack" to assert under controlling Circuit authority, and (3) that cause does not exist to grant relief from stay, we might end there.

250.    However, out of an abundance of caution, we will consider the propriety of continued injunctive relief pending a resolution of this Chapter 11 Case.

    i.    <u>Preliminary Injunction Standards</u>

251.    Preliminary injunctions are "extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances."[246] In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."[247]

252.    To obtain the requested preliminary injunction, the Debtor is required to make "a clear showing" "[1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [the Debtor's] favor, and [4] that an injunction is in the public interest."[248]

253.    Congress intended that standard to apply to § 105(a) preliminary injunctions."[249] Indeed, the Fourth Circuit has employed the traditional standard when reviewing an injunction staying actions against non-debtors under § 105(a).[250]

254.    "[T]he Fourth Circuit has made very clear that the critical, if not decisive, issue over whether injunctive relief should be granted is whether and to what extent the non-debtor litigation interferes with the debtors' reorganization efforts."[251]

---

[246] *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).
[247] *Id.* at 24.
[248] *Id.* at 20.
[249] *In re Excel Innovations, Inc.,* 502 F.3d 1086, 1094-95 (9th Cir. 2007) (citing S. REP. NO. 95-989, at 51 (1978), as reprinted in 1978.
[250] U.S.C.C.A.N. 5787, 5836-37 and H.R. REP. NO. 95-595, at 342, as reprinted in 1978 U.S.C.C.A.N.; *Piccinin*, 788 F.2d at 1003-09.
[251] *Brier Creek*, 486 B.R. at 694.

### a. Likelihood of a Successful Reorganization

255.    In bankruptcy proceedings, "success on the merits is to be evaluated in terms of the likelihood of a successful reorganization."[252] Courts also consistently recognize that satisfying this factor does not present a high bar.[253] In the typical chapter 11 case, it can be met where the debtor has demonstrated the financial ability to carry out a reorganization and efforts to negotiate with parties in interest.[254]

256.    DBMP has repeatedly stated that it seeks to resolve the DBMP Asbestos Claims permanently, globally, and equitably through the establishment of a Section 524(g) trust. And as this Debtor seeks to treat both present asbestos claims and future demands, and to afford permanent injunctive relief to the Protected Parties, nothing less than a Section 524(g) plan and injunction will do. This being so, we believe the evaluation must necessarily focus on the likelihood of a successful reorganization which includes Section 524(g) relief.[255]

257.    The Representatives argue that DBMP has failed to demonstrate such a likelihood. First, there has been no progress toward achieving a 524(g) plan—no filed plan, draft, or even a term sheet. Second, DBMP has not obtained funding commitments to the potential Section 524(g) trust from the "Protected Parties"—i.e., those that would benefit from a preliminary injunction. Third, a successful reorganization under § 524(g) is dependent on overwhelming creditor support.  Confirmation of a § 524(g) plan requires a supermajority of assenting current asbestos claimants.[256] Given all that has transpired, the Representatives confidently predict that the Debtor will be unable to gain that creditor support.  Finally, the Representatives suggest that

---

[252] *Bestwall*, 606 B.R. at 254.

[253] *Id.*

[254] *See Chicora Life Ctr.*, 553 B.R. at 66; *Litchfield Co. of S.C. Ltd. P'ship v. Anchor Bank (In re Litchfield Co. of S.C. Ltd. P'ship)*, 135 B.R. 797, 807 (W.D.N.C. 1992).

[255] On this narrow point, we respectfully disagree with our colleague's conclusion in *Bestwall* that an ordinary Section 1129 confirmation would suffice*. Bestwall*, 606 B.R. at 255.

[256] *See* 11 U.S.C. § 524(g)(2)(ii)(IV)(bb) (requiring 75% acceptance of voting asbestos creditors).

the Distributors of former CertainTeed's products do not fall within Section 524(g)'s four enumerated categories of derivative liability.[257] As these parties are not entitled to permanent injunctive protection, the Representatives say they should not receive preliminary relief either.[258]

258.    The ability of this Debtor to successfully reorganize under chapter 11 with a Section 524 trust and injunction is far from certain. Nevertheless, it within the scope of "likelihood." Assuming that agreement can be reached on the terms of a Section 524(g) plan and trust, by virtue of its present assets and with contribution from New CertainTeed (a corporation with significant financial resources) and perhaps other protected parties, the Debtor has the financial ability to appropriately fund a section 524(g) trust and to pay the administrative costs of the Chapter 11 Case.

259.    Admittedly, there have yet to be meaningful settlement negotiations or plan formulation actions in the case. However, here that does not demonstrate inability to reorganize, for two reasons. First, injunctions of this kind are often entered at the outset of the chapter 11 case necessarily when no plan or negotiations have occurred. Rather, the requested preliminary injunction is necessary to provide the Debtor with an opportunity to negotiate and formulate a plan that can then be confirmed. Thus, bankruptcy courts routinely grant preliminary injunctions before plans of reorganization have been filed.[259]

260.    Here, we are admittedly a year and a half into the case. Still, the fact that plan negotiations and plan formulation has not begun is not due to lassitude. From the first day

---

[257] *See* 11 U.S.C. § 524(g)(4)(A)(ii)(I)-(IV)).

[258] *See DeBeers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945) (courts should not grant a preliminary injunction when such injunction is not "of the same character as that which may be granted finally").

[259] *See, e.g., In re Kaiser Gypsum Co., Inc.,* No. 16-31602, Adv. Pro. No. 16-03313, at 5 [Adv. Pro. Dkt. 18] (Bankr. W.D.N.C. Nov. 4, 2016); *In re Garlock Sealing Techs. LLC*, No. 10-31607, Adv. Pro. No. 10-03145, at 6 [Adv. Pro. Dkt. 14] (Bankr. W.D.N.C. June 21, 2010); *In re Specialty Prods. Holding Corp.*, No. 10-11780, Adv. Pro. No. 10-51085, at 3 [Adv. Pro. Dkt. 47] (Bankr. D. Del. July 23, 2010); *In re W.R. Grace,* No. 01-01139, Adv. Pro. No. 01-00771 [Adv. Pro. Dkt. 32] (Bankr. D. Del. May 3, 2001); *In re Quigley Co., Inc.,* No. 04-15739, Adv. Pro. No. 04-04262, at 5 [Adv. Pro. Dkt. 122] (Bankr. S.D.N.Y. Dec. 17, 2004).

hearings, the asbestos claimants have decried this case filing as a massive fraud and have passionately urged this Court to deny injunctive relief to the Protected Parties.

261.    Given this, upon securing the appointment of the estate fiduciaries and professionals to represent them, resolution of the preliminary injunction motion was made the first order of business.  No one then envisioned that it would take a year and tens of millions of dollars of professional fees to reach a hearing. But the fact remains: this injunction was given top priority. Other case activities, like plan negotiations, have been deferred.

262.    The Debtor has on several occasions, voiced its willingness to engage with the Representatives toward a consensual resolution of this case. Obviously, the prepetition transactions which Old CertainTeed and DBMP have undertaken have poisoned the well, at least for the moment. Nevertheless, the offer has been made.

263.    DBMP has also attempted to move forward into other case matters, such as personal injury questionnaire motions and trust discovery, only to have the Representatives argue—and this Court to direct—that the preliminary injunction hearing should come first. Thus, DBMP cannot be faulted for a lack of diligence; nor is the lack of a plan or plan negotiations indicative of an inability to reorganize.

264.    As to the ACC's prediction that the asbestos claimants will never agree to a Plan, it is simply too early to tell. Having sat on two other hotly contested and apparently irreconcilable asbestos bankruptcy cases that wound up with consensual plans as between these constituencies (*Garlock Sealing* and *Kaiser Gypsum*[260]), this Court is unable to conclude that our parties cannot reach agreement, as well.  To find otherwise would effectively be to prejudge the

---

[260] The *Garlock* plan was approved by a supermajority of the asbestos claimants and confirmed without objection. The *Kaiser Gypsum* plan received a 100% favorable vote of the asbestos claimants, was recently confirmed, and is on appeal due to the opposition of  the company's insurer.

outcome of a Chapter 11 Case at its outset. Almost forty years of bankruptcy experience has impressed upon this Court that such prognostications cannot be accurately made in the early stages of a case.

265.    Similarly, it is simply too early in the case to determine whether any Protected Party is or is not eligible for section 524(g) relief.  That determination will be made at confirmation. If the Protected Parties are not so entitled, such relief will not be afforded them.  The current dispute after all concerns a preliminary, not a permanent, injunction. And the primary function of a preliminary injunction in a chapter 11 case is to afford the parties the time to sort out the finer points of the case and if necessary for the Court rule on their disputes.

### b.  Irreparable Harm to the Debtor

266.    The DBMP Asbestos Claims asserted to this point in the tort system, and those that are likely to follow, seek to recover on account of the same liabilities that the Debtor seeks to resolve through reorganization in bankruptcy. As previously described, prosecution of those same claims outside of this case would gravely harm, and almost certainly end, the Debtor's reorganization efforts.

267.    Moreover, the only way to make third parties liable for these claims would be for such plaintiffs to assert remedial causes of action like alter ego and successor liability claims as well as fraudulent conveyance claims which are either estate property or for which first crack is afforded to the bankruptcy estate. And the litigation of DBMP Asbestos Claims in the tort system while the Chapter 11 Case remains pending would undermine the purposes of chapter 11 and

section 524(g) to resolve all such current and future claims in a fair and equitable manner though a chapter 11 plan.[261]

268.     This is not assumption. In the few prepetition months of the Corporate Restructuring and DBMP's creation, dozens of new asbestos cases or amended complaints were filed seeking to pursue DBMP Asbestos Claims against one or more Protected Parties. The Representatives expressly oppose the entry of a preliminary injunction precisely to permit claimants to pursue such claims outside of this case.[262] Pursuit of even a small fraction of the more than 32,000 active cases (of more than 60,000 total claims) that the Debtor faced as of the Petition Date, would impose unsustainable burdens upon the Debtor's reorganization effort and, as we have said, would cause bedlam as these claims would be pursued in multiple courts. even as the parties are trying to negotiate their resolutions in this court.

269.     The parties have argued at length as to whether permitting DBMP Asbestos Claims to proceed against the Protected Parties would fix and liquidate contingent indemnification claims against the Debtor and whether under preclusion principles, the Debtor might be bound by such determinations. Because we have concluded that permitting such actions in the tort system would necessarily involve (1) determining claims against the debtor and (2) exercising control over estate property, we need not address these additional arguments. Irreparable harm has already been established.

---

[261] The Debtor also argues that this would divert the Debtor's officers from their duties, but this is not a compelling argument. This Debtor was designed not to have any employees but to borrow them from SGC, a conglomerate which boasts more than 171,000 employees. If the Debtor's employees are too few, SGC has but to second others to the cause.
[262] *See, e.g.*, Hr'g Tr., 31:5-9, Nov. 18, 2020.

### c.  Balance of the Harms

270.    As we discussed above with respect to stay relief, the demonstrated irreparable harm to the Debtor that would occur were the preliminary injunction lifted substantially outweighs any prejudice to the Defendants. We need not repeat all those points. Suffice it to say the harm to asbestos claimants appears to be delay in recovering what for most asbestos claimants will be but a small portion of their overall damages.

271.    The Representatives again argue that the Corporate Restructuring undermined the legal recourse available to asbestos claimants and has the characteristics of a fraudulent transfer.  They suggest that these potentially fraudulent actions of old CertainTeed tip the equitable balance against granting the preliminary injunction.

272.    As noted above in Section III(C), there is reason to question the propriety of the Corporate Restructuring and the Divisional Merger. However, it is because of this prospect—that there may have been a colossal general injury worked upon the asbestos claimants—that redress must be sought in the bankruptcy case on behalf of all claimants, and not piecemeal by a thousand individual plaintiffs, for their personal benefit, in a hundred different courts.

273.    As noted, if the Corporate Restructuring was in fact a fraudulent transfer, controlling Fourth Circuit precedent demands that the bankruptcy trustee be afforded the "first crack" at asserting the avoidance action.[263] And to the extent that the remedial claims are state law alter ego or successor liability theories, these are claims held under applicable state law by DBMP's bankruptcy estate under Section 541.[264]

---

[263] *Ruppert*, 187 F.3d at 441.
[264] *See* Section III(D)(ii).

75

274.    While the Representatives suggest that New CertainTeed is being improperly rewarded with a preliminary injunction for its predecessor's conduct, should a trustee (or the Representatives) assert those claims for the benefit of all asbestos claimants, then this injunction may not be a reward, at all. It would be a marshalling of those claims and those potentially responsible into a single forum, were the injuries might be addressed for the benefit of all asbestos claimants.  This would seem to be a superior result for such creditors as opposed to forcing each to bring, and finance, the same litigation separately. From a judicial economy perspective, it is a far superior procedure.

275.    In sum, the potential delays occasioned by the stay and injunction are outweighed by the greater harms that would arise otherwise—the almost certain termination of the Debtor's reorganization effort and a pell mell race to the courthouses.

### d.  Public Interest

276.    Courts have consistently affirmed the public's interest in a successful reorganization, which interest may be at its greatest in mass-tort bankruptcies.[265] This Court agrees.

277.    DBMP's successful reorganization also would promote Congress's particular goal in section 524(g) by establishing an asbestos trust that would efficiently and equitably resolve tens of thousands of asbestos claims.[266] A section 524(g) trust "will provide all claimants—including future claimants who have yet to institute litigation—with an efficient means through which to equitably resolve their claims."[267]

---

[265] *See U.S. v. Whiting Pools, Inc.,* 462 U.S. 198, 204 (1983)*; Robins*, 788 F.2d at 1008; *W.R. Grace & Co.*, 386 B.R.at 52.
[266] *See In re Congoleum Corp.*, 362 B.R. 198, 201 (Bankr. D.N.J. 2007); *see also* Bates Report ¶ 51.
[267] *Bestwall*, 606 B.R. at 257; *see also* Bates Report ¶ 10.

278.    There is, of course, no public policy interest in aiding a fraud on creditors
if that is what the Corporate Restructuring and Divisional Merger turn out to be.  But again, this
is a preliminary injunction, implemented so that the proper inquiry can be made. Or as Judge
Beyer put it in *Bestwall*, this Preliminary Injunction is necessary to protect the Debtor during its
efforts to reorganize, but it will not "allow any party to escape any asbestos related liabilities,"
and a permanent channeling injunction will only be granted in connection with a confirmed plan
of reorganization that meets the requirements of section 524(g).[268]

279.    It is far from certain that granting the preliminary injunction will result in
the parade of horribles that the Representatives suggest.  If DBMP and New CertainTeed are true
to their word, if they are committed to providing "full and fair" resolution of these asbestos
liabilities, then the parties may reach accord. If not, safeguards and creditor protections remain
available to the asbestos claimants in this bankruptcy case, including—state and federal
fraudulent transfer law (which applies to Texas divisional mergers), the ability to dismiss a
bankruptcy case if circumstances warrant, and the plan confirmation requirements under the
Bankruptcy Code (especially including the legal requirements for obtaining a channeling
injunction under section 524(g)). None of those protections is affected by the grant of the
preliminary injunction.

280.    Again, continued litigation of DBMP Asbestos Claims against Protected
Parties in the tort system while the Debtor attempts to address and resolve those same claims in
this Chapter 11 Case would undoubtedly interfere with, and almost surely end, the Debtor's
reorganization. With thousands of claims and proceedings spread out across the country, it would
be all but impossible to negotiate or confirm a Section 524(g), or any other, plan.

---

[268] *Bestwall*, Adv. Pro. No. 17-03105, slip op. at 5 [Adv. Pro. Dkt. 190] (Jan. 31, 2020).

281.    Thus, while this Court has concerns about the propriety of what Old CertainTeed wrought in the Corporate Restructuring and Divisional Merger, controlling law and present realities require that the Preliminary Injunction be maintained while this reorganization case proceeds.  The Preliminary Injunction will be Granted.